D9cdendm

                              Motion

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    ENDO PHARMACEUTICALS INC,

4                   Plaintiff,            New York, N.Y.

5              v.                         12 Civ. 8985 (TPG)

6    ACTAVIS INC, et ano.,

7                   Defendants.

8    ------------------------------x

9    ENDO PHARMACEUTICALS INC,

10                  Plaintiff,            New York, N.Y.

11             v.                         13 Civ. 3288 (TPG)

12   ROXANE LABORATORIES, INC.,

13                  Defendant.

14   ------------------------------x

15                                        September 12, 2013
                                          11:48 a.m.
16
     Before:
17
                       HON. THOMAS P. GRIESA,
18
                                          District Judge
19

20

21

22

23

24

25

                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

D9cdendm
                        Motion

 1                        APPEARANCES

 2   DECHERT LLP
          Attorneys for Plaintiff
 3   BY:  MARTIN J. BLACK
          ROBERT D. RHOAD
 4
     HOLLAND & KNIGHT LLP (NY)
 5        Attorneys for Defendant Actavis Inc.
     BY:  CHARLES ALAN WEISS
 6        NICHOLAS PETER CHIARA
          ERIC HAROLD YECIES
 7
     LOCKE LORD LLP
 8        Attorneys for Defendant
          Roxane Laboratories, Inc.
 9   BY:  ALAN B. CLEMENT
          KEITH D. PARR
10        WASIM K. BLEIBEL

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D9cdendm
                                    Motion

 1          THE CLERK:  Endo Pharmaceuticals versus Actavis and

 2   Endo Pharmaceuticals v. Roxane Laboratories.

 3          THE COURT:  OK.  We are going to run until about

 4   12:30, I guess a little after that.  Who wants to present what?

 5          MR. BLACK:  Your Honor, it's plaintiff's motion for a

 6   preliminary injunction.  When we were here before, your Honor

 7   suggested that we take up the issue of the defendants' license

 8   defenses to try to clear that out, and today is the hearing on

 9   that issue.

10          The briefs have been submitted, declarations have been

11   submitted, and the question before the Court is whether or not

12   their license defense is so strong that it would preclude us

13   from getting preliminary injunctive relief.  We think that the

14   licenses themselves are quite clearly not express licenses to

15   the patents in suit and that their implied license theory is

16   contrary to the agreement, the negotiating history --

17          THE COURT:  Well, there were licenses.

18          MR. BLACK:  That is correct, your Honor.  And the

19   question before the Court is whether those licenses, which call

20   out specific patents, that they had the rights to use, covered

21   also patents which issued after the prior litigation had

22   settled and in one case a patent which Endo acquired after the

23   license had been entered into.  These agreements were

24   explicitly negotiated between the parties, and the patents to

25   be included in the agreements were explicitly negotiated.

D9cdendm
Motion

1        The defendants' positions with respect to what

2    patents --

3            THE COURT:  Why weren't their licenses -- the new

4    patents are not, you know, the difference of night and day.

5    They are very similar, are they not?

6            MR. BLACK:  No.  They are actually very different,

7    your Honor.

8            THE COURT:  They are very different?

9            MR. BLACK:  They are very different.

10           THE COURT:  What are the differences?

11           MR. BLACK:  The '482 patent, which is applicable to

12   Actavis, it relates to the underlying chemical -- active

13   chemical ingredient, oxymorphone, a particular way of producing

14   an oxymorphone that is pure in form.

15           The other two patents relate to what's called

16   dissolution profile --

17           THE COURT:  The patents that were licensed, what were

18   they about?

19           MR. BLACK:  The patents that were licensed related to

20   specific formulation for a product which in the case of the

21   defendants included their product.  However, your Honor -- and

22   this is the important point --

23           THE COURT:  You are not really answering my question.

24           MR. BLACK:  The issue here, your Honor, it all goes

25   back to the '250 patent.  Maybe it will be helpful -- I have a

D9cdendm
Motion

1   chart that shows the patents' relationships.  Would it be

2   helpful for me to --

3          THE COURT:  It certainly would.

4          MR. BLACK:  Thank you, your Honor.

5          If you take a look at slide 8, your Honor, this

6   encapsulates the issues in the case.

7          THE COURT:  Where are you?

8          MR. BLACK:  This is the rather busy chart with boxes

9   and patents on it.

10          THE COURT:  What page?

11          MR. BLACK:  Page 8.

12          THE COURT:  Oh, page 8.  All right.

13          MR. BLACK:  Page 8.

14          THE COURT:  OK.

15          MR. BLACK:  OK.  So this is what you would call a

16   patent family tree, which shows relationships between patent

17   applications.  The patent at the top in yellow, the '250

18   patent, that was a patent that was owned by Endo at the time of

19   the prior litigation but which all the parties agreed did not

20   cover the defendants' products.  Now, I want to stress that.

21   It was agreed that it did not cover the defendants' products.

22   We never sued on that patent.  And when we settled the

23   litigation over the patent we did sue on, we said, fine, we

24   haven't sued you on this '250 patent.  It requires five

25   different ingredients, none of which are in your products, and,

D9cdendm
                                  Motion

1   fine, we'll agree not to sue you in the future on it because

2   you don't infringe.

3          The defendants also said that they would like licenses

4   to patents that are called continuations, or claim priority to

5   the '250 patent.  And the reason for that is that a patent in

6   existence, if it's still being prosecuted in the Patent Office,

7   you can file what's known as a continuation patent, continue

8   prosecution, and get additional claims, but the continuation

9   has to be the same invention and the claims are often almost

10  identical or virtually identical.

11         And so it was quite logical -- and, indeed, it is

12  quite common to handle it this way -- the parties agreed that

13  the '250 patent, which we said didn't even cover their product,

14  that we agreed that any patents which were continuations of the

15  '250 would also fall within the scope of their rights.  And

16  that's what was agreed to in the prior litigation.  It was a

17  patent that we all agreed didn't cover their product.

18         Today we have two patents that, in green, on the

19  bottom here, your Honor, the patents in suit, the '122 and the

20  '216, that we say does cover their product.  There couldn't be

21  more of a difference with respect to the scope of the claims

22  than a patent which we all agreed didn't cover the product.

23         THE COURT:  I thought you were going to describe what

24  was licensed.

25         MR. BLACK:  What was licensed, your Honor, was the

                       SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

D9cdendm
                                   Motion

1   '250 patent, in yellow, and continuations.  We have arrows

2   showing the sort of family relationship here.  So if you think

3   of, and the patent lawyers often talk about --

4            THE COURT:  What is the '250 patent?

5            MR. BLACK:  That was a patent that related to a

6   sustained release drug with a base that had five specific

7   ingredients.  It had xanthan gum, locust bean gum and three

8   other ingredients in it, none of which were in the defendants'

9   product.  So we never asserted that their products ever

10  infringed that patent.

11           And when we settled the case over the --

12           THE COURT:  What were their licenses?

13           MR. BLACK:  They have a license on the '250, and they

14  have a license on the patent that we litigated, which just

15  expired, but that's irrelevant to this dispute.  It has not

16  been asserted to be a basis for any relief in this case.

17           THE COURT:  I'm sure I'm asking something that is

18  probably infantile, but I'll ask anyway.

19           They did not -- "they" being the defendants -- did not

20  infringe '250, right?

21           MR. BLACK:  That is correct.

22           THE COURT:  But you say there was a license?

23           MR. BLACK:  We gave them a covenant not to sue.  When

24  we settled the original case -- I'll have to back up one more

25  step, your Honor.  I'm sorry.

D9cdendm

Motion

1            This area of the law, we have so much jargon.  But

2      there is something called the Orange Book, which is a book

3      that's kept at the FDA.  It used to actually be an Orange Book;

4      today it is, of course, on the computer.  And when someone like

5      Endo gets a product issued by the FDA approved, they list the

6      patents on the Orange Book to give notice to the public.  And

7      when a generic comes along and says they'd like to make a

8      generic, the generic has to provide a certification to the FDA

9      that says we don't infringe those patents, or those patents are

10     invalid, and when that happens we have litigation.

11           Now, Endo's position, they certified to all the

12     patents.  One of the patents they did infringe and we sued them

13     on.  The '250, though, had five specific ingredients that were

14     not in their products.  And they wrote us a letter and said,

15     hey, these ingredients aren't in our products, we don't

16     infringe.  We looked at it and said, you are right.  So we

17     never had any litigation over the patent.

18           When we settled the case over the patent we were suing

19     them on, they said, you know what, for, you know, belt and

20     suspenders, we want a covenant that you are never going to sue

21     us on this '250 patent.  We said, fine.  We've already told you

22     that you don't infringe and so we'll put it in a license.  And

23     they said, well, we want to make sure that if there is

24     continuations of the '250, that those are covered also.  And we

25     said, fine.  You know, that's -- we had absolutely no dispute

D9cdendm
Motion

1   about the '250.

2           Today we have a dispute because there are two other

3   patents that have different disclosure in them, that have

4   different inventions, and which on this preliminary injunction

5   proceeding the defendants have not contested infringement.

6           I want to make this clear.  The '250 patent, everybody

7   agreed they didn't infringe.  And when we settled the original

8   case we said, fine, we're not going to sue you on it.  And now

9   we've got new patents that they do infringe and they don't even

10  deny infringing and we'd like to proceed, and their position is

11  that those patents are licensed.

12          THE COURT:  Their position is that their patents?

13          MR. BLACK:  Their position is that we are barred from

14  suing them on these newly issued patents that they do infringe

15  as a result of those patents' relationship to the '250, which

16  does not cover their product.  I cannot put it any more clearly

17  than that.

18          THE COURT:  Well, the only thing is is there some way

19  that you can describe something about the products?  What

20  products -- I mean, what was the '250 patent?

21          MR. BLACK:  The '250 patent was a -- the product

22  itself is an opioid, a pain reliever.  The '250 --

23          THE COURT:  A pain reliever, OK.

24          MR. BLACK:  The '250 patent covers products that have,

25  as the base -- a product often has, almost always, has an

D9cdendm
                                 Motion

1   active ingredient and some inactive ingredients.  The inactive

2   ingredients can be quite important in the context of a

3   sustained-release drug that's going to go into and become

4   active in the body for 12 or 24 hours.  It is especially

5   important with an opiate because you don't want to have a real

6   spike in the drug; it could be extremely harmful.

7          The '250 patent had very specific claims that covered

8   the use of in the excipient, the inactive ingredients, of locus

9   bean gums, xanthan gum and five other ingredients -- three

10  other ingredients.  They had to be in very specific

11  combinations and very specific percentages --

12         THE COURT:  And their purpose was to do what?

13         MR. BLACK:  The purpose was to enable the formulator

14  to let the drug release into the body at a rate which would

15  give pain relief but not spike so high that it would cause

16  injury and that it would last for a lengthy period of time.

17         THE COURT:  Just a minute.

18         (Pause)

19         Here's my note.  '250 involved a pain reliever and

20  there was something in that '250 patent which involved the

21  release in such a way that there was no sudden spike, as you

22  put it, and it would last for several hours.  Have I put it

23  down right?

24         MR. BLACK:  Yes, your Honor.

25         THE COURT:  All right.  Now, that's the '250 patent.

D9cdendm
                                    Motion

1    And I know that the defendants can speak for themselves, but

2    just to save us time, what do you understand their -- what is

3    the claim of that group about licensing?

4              MR. BLACK:  The claim about not licensing, your Honor,

5    if you look at -- so if you look at my chart on page 8 here, we

6    all agree that the patents in the box on the top right, those

7    things that are continuations of the '250 -- that is where

8    things continue to happen in the Patent Office -- that's

9    licensed.  The patents at issue here are the '122 and the '216,

10   which are not continuations of the '250.  They are on the

11   bottom right.  Now --

12             THE COURT:  And what are they?

13             MR. BLACK:  They are relating to -- they are also

14   relating to controlled-release pharmaceuticals, because that's

15   what's at issue in the case, but the claim is completely

16   different.  It relates to placement of the composition in in

17   vitro dissolution test and specific parameters for the test

18   which demonstrates that at certain temperatures and that the

19   oxymorphone, which is the active ingredient, is released from

20   the tablet in the first claim in about one hour in the test.

21   To infringe that claim you have to run a specific test and the

22   product has to be within a particular parameters of

23   dissolution.

24             THE COURT:  What is oxymorphone?

25             MR. BLACK:  Oxymorphone is very similar to Oxycontin.

D9cdendm
                              Motion

1   Oxycodone and oxymorphone are both very strong morphine-like

2   substances.

3            THE COURT:  Pain killers?

4            MR. BLACK:  Pain killers.  Very strong pain killers.

5   They are Schedule II controlled substances.

6            What this case is about is we had originally had on

7   the market our original oxymorphone product.  We took it off

8   the market and developed a new and improved product that is not

9   as desirable to drug addicts, your Honor.  It cannot be ground

10  up and snorted the way the earlier version can.  And we came

11  out with this improved product, and that's why we're here, to

12  protect the improved product.

13           THE COURT:  And the improved product is --

14           MR. BLACK:  It is also oxymorphone-based, but as I

15  mentioned, there is the active ingredient and the excipient.

16           THE COURT:  And what you are talking about now are the

17  '122 and '216 patents?

18           MR. BLACK:  Right, your Honor.  The claims are very

19  different from the '250, and the claims --

20           THE COURT:  Before you get into that, but that's --

21  did the '250 involve oxymorphone?  Was it oxymorphone or for

22  bean or what?

23           MR. BLACK:  Oxymorphone, your Honor.  Oxymorphone is

24  actually a very old drug; it is off patent.  The trick here is

25  the extended release of oxymorphone for 12 or 24 hours.  There

D9cdendm
                              Motion

1    are a lot of different ways to do that.  And one way do it was

2    the way we describe in the '250 patent, using locus bean gum

3    and xanthan gum, which is not the way that the defendants used

4    it and we therefor didn't sue them on it because it would have

5    been a Rule 11 violation to do so.  We all agree they didn't

6    infringe that patent.

7            Another way to get this extended release is by using

8    the inventions in the '122 and '216.  It is a different way of

9    going about it.  The '250 was not infringed but these patents

10   are.

11           Should I turn to the license, your Honor?

12           THE COURT:  Well, the way you describe it, to the

13   extent there was a license or an agreement not to sue, or

14   whatever, it pertains solely to the '250 patent and

15   continuation --

16           MR. BLACK:  Precisely.

17           THE COURT:  -- is that right?

18           MR. BLACK:  Yes, your Honor.

19           THE COURT:  And you're saying that -- and, obviously,

20   they put out some products, the defendants.  And you're simply

21   saying that the patents that you are now suing on are very

22   different from '250, right?

23           MR. BLACK:  Right.  And that they have never been

24   licensed.  They are so different that on the '250 we all agree

25   they didn't infringe, and the on '122 and '216 they have not

D9cdendm
                              Motion

1    even contested infringement.

2              THE COURT:  OK.  Can we hear from the other side?

3              MR. WEISS:  Thank you, your Honor.  I will just

4    introduce myself and then sit back down.  Charles Weiss for

5    Actavis.

6              There is one point that I want to clarify and

7    Mr. Black may have misspoken.  I think I know what he meant but

8    it may not have really been clear.  He said we are here to

9    protect the improved product.  That makes it sound as if the

10   product that we are here about today is not the product that

11   was settled and licensed in 2009.  That is wrong.  It is the

12   same product, and the plaintiff concedes that it is the same

13   product.

14             Now, plaintiff --

15             THE COURT:  He hasn't conceded.

16             MR. WEISS:  In their papers they do and in their

17   complaint they do.

18             MR. BLACK:  It is the same product, your Honor,

19   different patents.  The first batch were not infringed.  This

20   batch are infringed.

21             THE COURT:  I don't understand what you are now

22   saying.

23             MR. BLACK:  The product that they're selling, your

24   Honor, that was an issue in the last case is the same -- it is

25   the same product they would like to sell now.

D9cdendm
Motion

1              The problem is we didn't have an opportunity to

2      litigate the two patents that they do infringe because they

3      hadn't been issued yet.  They're trying to bootstrap our

4      agreement not to sue them on the '250 patent, which we all

5      agreed they did not infringe, into a defense in this case.  And

6      that's just wrong.

7              What was licensed were specific patents, not Endo's

8      entire portfolio of patents.

9              THE COURT:  Well, Mr. Weiss.

10             MR. WEISS:  Thank you, your Honor.

11             So Endo does have a new product, which is protected by

12     a whole bunch of other patents.  There is a request to sell

13     that new product pending at FDA by Actavis.  That is a

14     different lawsuit.  It is in front of your Honor also.  That is

15     the new product.

16             The product that we're here today on, on this

17     preliminary injunction application, is, as Mr. Black states

18     correctly, it is the same product that was litigated in 2008

19     and settled in 2009.  So Endo is saying, although we granted

20     you a license under the patents to begin selling in 2013, you

21     can't do it.  So they have two arguments -- or we have two

22     arguments.

23             Now, the first one, which is what Mr. Black talked

24     about, is whether the new patents would be called continuations

25     of the old one.  And I like his chart; I couldn't have done it

D9cdendm
Motion

1   better.  So he has in blue the '357 application that was filed

2   on July 6, 2001.

3          Your Honor can see that that application is --

4          THE COURT:  I can't even read that through the color.

5          MR. WEISS:  Well, I would apologize but it is not my

6   chart.  But in any event, it does say filed --

7          MR. BLACK:  I apologize.

8          THE COURT:  Is the there writing in this dark -- I

9   can't even see the writing.

10          MR. WEISS:  There is, your Honor.  Let me just read

11   out the critical thing.  The blue box on the left --

12          THE COURT:  Why do people put writing in dark-colored

13   boxes?  I can never understand that.

14          MR. BLACK:  I apologize, your Honor.  We had some

15   trouble reading it ourselves.  I will endeavor to correct that.

16          MR. WEISS:  So if I could, your Honor?  So that is --

17   I will just give the Court the key points in there.

18          That's application number '357, and it was filed on

19   7/6/2001; July 6, '01.  As the Court can see from the way the

20   lines go, everything goes back to that application.

21          The family on the top, which is the '250 patent, where

22   Endo has the red box that says "Patents Licensed," and the

23   family on the bottom, where he says "Patents-in-Suit" that's

24   green, they all go back to that application.  And that

25   application was filed three months before all the other ones on

D9cdendm
                        Motion

1    the left.  Endo chose to claim priority to that application to

2    get that date.  With the benefit of that comes the burden of

3    that, and these are continuations.  They all go back to the

4    same application.

5              THE COURT:  You mean 7/6/01?

6              MR. WEISS:  Yes.  Well, that's the date, the one that

7    was filed on 7/6/01, and the number is '357.  It is the one in

8    blue.

9              So, first of all, it is the same product.

10             Second of all, they are all related.

11             THE COURT:  Here's what is going through my mind, and

12   maybe if I state this it will simplify, maybe it won't.

13             Actavis and Roxane -- have I got the names right?

14             MR. CLEMENT:  Yes, you do, your Honor.

15             THE COURT:  OK.  They have been putting out products

16   and there was an earlier litigation, and somehow the '250

17   patent of Endo was dealt with in some way in that litigation

18   and it was agreed that the products of Roxane and Actavis did

19   not infringe the '250 patent.  And the products of Actavis and

20   Roxane didn't then and they wouldn't now.

21             Now, what is going through my mind now -- it could be

22   a great oversimplification so the lawyers should correct me,

23   but it's my understanding, as I hear the discussion, that

24   Actavis and Roxane are still making the same products.  But

25   Endo comes along with patents '122 and '216 -- new patents --

D9cdendm

Motion

1   and products that Actavis and Roxane had been making for some,

2   whatever, number of years, all of a sudden there are some new

3   patents obtained by Endo and Endo says the products you've been

4   making all these years infringe the new patents.

5          Have I summarized things right or not?

6          MR. WEISS:  Largely, your Honor.  Let me just clarify

7   one point.

8          THE COURT:  OK.

9          MR. WEISS:  When the Court said we've been making the

10  products all these years --

11         THE COURT:  When you are talking, about how many

12  years?

13         MR. WEISS:  So the settlement with Actavis was in

14  2009.

15         THE COURT:  OK.

16         MR. WEISS:  And we've been on the market since 2011

17  with two of the strengths.

18         So this product, like a lot of drugs, it has like

19  5-milligram, 10-milligram, 20-milligram, there are different

20  strengths.  The settlement with Actavis allowed Actavis to go

21  to market with two strengths in 2011, which it did, which it

22  has been selling continuously, and allowed it to go to market

23  in 2013 with respect to all of the other strengths.

24         So these are the same drug.  It is the same approval.

25  It is the same Abbreviated New Drug Application.  It is the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D9cdendm
                              Motion

1    same formulation.  But I don't want the Court to misunderstand

2    that only two of the strengths have actually been on the market

3    since 2011.  The others, per the settlement agreement, could

4    not be sold until 2013, which is why we're here in 2013.

5              MR. BLACK:  I would like to clarify.

6              MR. CLEMENT:  Your Honor, on behalf of Roxane, if I

7    may?

8              THE COURT:  Yes.  Please.  You are?

9              MR. CLEMENT:  Mr. Clement, Alan Clement.

10             THE COURT:  All right.

11             MR. CLEMENT:  So somewhat similar to Actavis, Roxane

12   actually has not been selling any product.  We had this earlier

13   lawsuit based on an ANDA that Roxane filed back in 2010.  Endo

14   looked at that ANDA, and it fully describes the product that

15   Roxane would sell today if they could.

16             THE COURT:  Looked at what?

17             MR. CLEMENT:  They looked at our ANDA; it is an

18   Abbreviated New Drug Application.  It completely describes

19   every little nuance of the product that the party, that the

20   generic company, is trying to -- is seeking approval from the

21   FDA.  Before you can sell a product, a prescription drug

22   product, you need approval from the FDA.  So you need to clear

23   FDA hurdles and you also need to clear patent hurdles.

24             So in 2010 we filed our drug application, and we have

25   to describe everything about it -- what it is made of, how it

D9cdendm
                              Motion

1    dissolves, how it acts on the body, all of these things -- to

2    the FDA.  That information was given also to Endo in that suit.

3    That's what caused the first suit, which also involved the '250

4    patent and a couple of other patents.

5            During that lawsuit it was agreed to settle that

6    lawsuit.  They knew what our product was.  If Roxane was ever

7    going to sell the product, they knew what it was.  They decided

8    to settle that litigation as to all the patents Endo had at

9    that time.  They said once certain other parameters are met,

10   other parties' exclusivities, then Roxane would be entitled to

11   enter the market.

12           Roxane has now obtained its approval from the FDA, all

13   those other exclusivities have expired, and Roxane should be

14   entitled to sell the product described in that very same ANDA,

15   Abbreviated New Drug Application, that Endo previously agreed

16   in settlement of a lawsuit to license, Roxane should be

17   entitled to go to market with that product.

18           MR. BLACK:  If I might --

19           THE COURT:  Let me just follow up with what I think I

20   would like to follow up with for the moment.

21           Now, I think, the status of what Mr. Weiss and

22   Mr. Clement have described, I'll assume they've described

23   things correctly as far as they go.

24           Now, the new elements that come in, you've got these

25   products that either were being sold or being described as

D9cdendm
                            Motion

 1    Mr. Clement says and being submitted for approval and so forth.

 2    OK.  All of which is kind of a machinery that's going on

 3    beginning 2009 or thereabout, whatever.

 4            Now, so all of this is set up.  It's been agreed to.

 5    The products are either being sold or their permission is being

 6    obtained to sell them and so forth.

 7            Now, along comes Endo with two new patents and says

 8    all these things that you have been selling or been seeking

 9    approval of violate the new patents.

10            Isn't that the situation?

11            MR. WEISS:  Yes, your Honor.

12            MR. BLACK:  In part, correct, your Honor.  Largely

13    correct.

14            THE COURT:  I mean, just sitting here as a judge, and

15    almost as a layman, that sounds so terribly unfair.  It sounds

16    terrible.

17            You make these agreements.  These agreements are acted

18    on.  And then you file a couple of new patents, and you say all

19    these things you agreed to let them do infringe the new

20    patents.

21            MR. BLACK:  Your Honor --

22            THE COURT:  I mean, that just sounds like -- is this

23    America or not?  It sounds terrible.

24            MR. BLACK:  Your Honor, this is not, as you said, in

25    some ways you are a layman on this.  These defendants knew

D9cdendm
                                    Motion

 1   exactly what was happening.  These applications were published

 2   and known.  There were explicit negotiations with Roxane where

 3   Mr. Donatiello, from Endo, sitting in the back of the room,

 4   told the negotiator for Roxane that they were not going to get

 5   rights to these patent applications, and if these patents ever

 6   issued we would have a dispute that would have to be resolved.

 7   They have not launched these products yet that are at issue in

 8   the preliminary injunction.  Our purpose is to try to maintain

 9   the status quo until we can have our patent claim adjudicated.

10   We can't bring a patent claim until the Patent Office issues

11   the patent, which didn't happen until late last year.

12             THE COURT:  You know, you're really not saying

13   anything that is very helpful to me.

14             I mean --

15             MR. BLACK:  Your Honor, would it be helpful if it were

16   proved, as I think it is, that Roxane was aware at the time

17   that it entered into the agreement that these patents could

18   issue and that they agreed with Endo not to take a license,

19   that they were not getting a license on these patents; that

20   this was known to the parties and it was part of the agreement?

21             THE COURT:  Then it seems to me that Actavis and

22   Roxane were doing an awful lot of wheel spinning.

23             MR. BLACK:  Nobody knew for sure whether these patents

24   were going to issue.

25             THE COURT:  Which patents?

D9cdendm
                              Motion

1              MR. BLACK:  The two, the '122 and the '216 patent were

2       in the Patent Office at the time that the prior case was

3       settled.  The Patent Office may never have issued the patents;

4       the Patent Office may have issued it.  As it happened, these

5       patents went up to the Federal Circuit before they were issued,

6       and now the Federal Circuit told the Patent Office that they

7       needed to issue them.

8              But none of that happens and the patents didn't issue

9       until late last year.  And we brought the case before they've

10      come to market with the dosage strengths that are at issue and

11      said, hey, we got a patent claim now.  If we had this claim

12      five years ago, we would have brought it but we didn't have it

13      because those patents were still being reviewed by the Patent

14      Office and the Federal Circuit.  But now we have a claim.  We

15      have a constitutional claim.  We have a claim to assert these

16      patents.  It is a property right.  And all we're asking at this

17      point is that that property right is adjudicated before they

18      launch and disrupt the market.  And that's what we're here for.

19             MR. CLEMENT:  Your Honor, for Roxane, if I may for

20      Roxane?

21             I think that what Mr. Black is saying is absolutely

22      contrary to the language in the agreement with Roxane.  The

23      Roxane agreement defines the licensed patents as any United

24      States patent applications -- and you can read this from slide

25      6 of Endo's slide package -- any United States patent

                                Motion

1    applications that claim priority to the Opana ER Patents,

2    including any continuations, continuations-in-part and

3    divisionals.

4             OK.  So it's not limited to continuations,

5    continuations-in-part or divisionals, as Mr. Black would like

6    you to believe.

7             It also has this language, that the parties agreed to

8    that is in the agreement, that says that it includes any patent

9    applications that claim priority to the Opana ER patents.

10            And if you go back to Mr. Black's chart, which is on

11   page 8, you can see that the green blocks claim priority back

12   to the blue block, which is a priority claim to the '250

13   patent.  So it is within the explicit language of the agreement

14   as written.

15            THE COURT:  Well, I have to confess to you, I don't

16   understand what you're saying.  I'm trying to.

17            MR. CLEMENT:  All right.

18            THE COURT:  I don't quite understand it.  Go over this

19   again.

20            MR. CLEMENT:  Sure.  OK.  Can I give you my slide

21   pack?  Can I approach?

22            THE COURT:  Of course.

23            (Handing to the Court)

24            MR. CLEMENT:  Your Honor, if you would look at slide 6

25   first.  This is just to show that there is a settlement

D9cdendm
                              Motion

1    agreement and license between Endo and Roxane.

2              Are you with me?

3              THE COURT:  All right.  Let me find 6.

4              MR. CLEMENT:  OK.

5              THE COURT:  OK.  I've got 6.

6              MR. CLEMENT:  So 6 is just a cover page to show that

7    there was a settlement agreement of that earlier lawsuit that

8    we had spoken about.

9              If you turn the page, all right, that presents to you

10   Section 4.1 of the Agreement, which sets forth what is the

11   license that is granted.  And the license is from Endo to

12   Penwest -- Endo and Penwest hereby grant to Roxane a

13   nonexclusive, nontransferable, nonsublicenseble, royalty-free

14   license under something known as the licensed patents.  OK.  So

15   they are granting a license under the licensed patents so that

16   Roxane can make, use, or sell the Roxane products.

17             OK?  That's what the licensed patents --

18             THE COURT:  Wait a minute.

19             (Pause)

20             OK, go ahead.

21             MR. CLEMENT:  Now we have to understand what are these

22   licensed patents.  That becomes the question.  Roxane has a

23   license under the licensed patent.  If you flipped two pages --

24             THE COURT:  Wait a minute.  Where is the --

25             MR. CLEMENT:  About seven lines down, "Under the

D9cdendm
                            Motion

 1   Licensed Patents, during the licensed" --

 2              THE COURT:  One, two, three, four -- under the

 3   "Licensed" --

 4              MR. CLEMENT:  "Patents."

 5              MR. BLACK:  Your Honor, if you look at our slide 3, it

 6   has the same information but ties it together with some arrows,

 7   too.

 8              THE COURT:  OK.  Go ahead, Mr. Clement.

 9              MR. CLEMENT:  So if we go two more pages in the slide

10   book to page 9, that is where "licensed patents" are defined in

11   the Endo/Roxane License Agreement.

12              And you can see from that language there are three

13   different types -- three different groups of patents that are

14   licensed.  A is "Any United States patent that was now owned by

15   Endo and issued as of the effective date of this agreement."

16   All right.  That's not what we're talking about here today.

17   OK?

18              B -- this is what we are here talking about -- "Any

19   United States patent applications that claim priority to the

20   Opana ER patents."  And then it goes on, it says, "including,"

21   which means -- which is a broad term which means it includes

22   these but it can also include other things.  "Including any

23   continuation, continuation-in-part, and divisional applications

24   that claim priority to the Opana ER patents."

25              And it goes on in each case that Endo or Penwest could

D9cdendm
                                    Motion

 1   assert, would be infringed by the making, using, or selling of

 2   the Roxane product.

 3              So the key language here, your Honor, is that first

 4   phrase.  It says, "Any United States patent applications that

 5   claim priority to the Opana ER patents."  OK?  And what has

 6   happened here, your Honor, is the two patents that are being

 7   currently asserted against Roxane, the '122 and the '216, they

 8   claim priority to the Opana ER patents precisely as --

 9              THE COURT:  What is the Opana ER patents?

10              MR. CLEMENT:  OK.  The next slide, your Honor, tells

11   you what the Opana ER patents are.  I'm sorry, I should have

12   directed your attention to this.  But it is the three patents,

13   the '933, the '456 and the '250.  The '250 being key.

14              THE COURT:  Go back to the language on page 9.

15              MR. CLEMENT:  All right.  9 says claim priority to

16   those patents, to any one of those three patents.  What we're

17   saying, what Roxane says, is that claim priority to the Opana

18   ER patents includes claims priority to the '250 patent.  And

19   precisely as shown in Endo's chart with the blue and the green

20   and the yellow charts, it goes back and shows this claim to

21   priority.

22              And we can see that, your Honor, in our slides, as

23   well.  If you turn to slide 13 --

24              THE COURT:  I am really am -- I'm not taking in, as I

25   would like to, what is being presented here.  Is there any way

D9cdendm

                                    Motion

1   you can simplify it or --

2              MR. CLEMENT:  Sure.  What I'm saying, your Honor,

3   is --

4              THE COURT:  -- or summarize it?  I will be very frank

5   with you; I'm just not taking it in.

6              MR. CLEMENT:  I think, your Honor, what I'm trying to

7   say here is that these '122 and '216 patents were contemplated

8   by the Agreement as written, by this language claims priority

9   to, because, as Endo has shown, there is a common linkage

10  between all these patents, that the '122 and the '216 were

11  licensed at the same time the '250, the -- all of the Opana ER

12  patents.  That is what I am trying to say as simply as

13  possible.

14             THE COURT:  Well, I can understand that.

15             MR. CLEMENT:  And, your Honor, there was a reason for

16  Endo wanting to claim priority to these patents.  If I may

17  continue?

18             THE COURT:  Well, what is the significance of claiming

19  priority?

20             MR. CLEMENT:  Claiming priority means you needed it to

21  rely on to file your new application.  There is information in

22  an old application that you needed to rely on to make your new

23  claim.

24             And if I could show you, your Honor, actually?  If you

25  turn to slide 17?  Slide 17 discloses -- shows where the

D9cdendm
                              Motion

dissolution profiles, how these patents all tie together.

          OK.  What I have in the upper left-hand corner is
what's in the blue box in Endo's diagram.  That's that '357
provisional filed on 7/6/01.  OK?  And in that -- this is what
this is all about, your Honor.  There they had some examples of
formulations that would have certain amounts of oxymorphone
released in a beaker over a certain time period as it
dissolves.  OK?  And what happens is they carried that same
profile into the '250 patent.  It's Table 4 in the '250 Patent,
and it's also in the two new patents Endo is trying to assert,
the '122 and the '216.  They need --

          THE COURT:  What do you mean -- when you say something
is also in '122 and '216, what is it that is in there that is
significant?

          MR. CLEMENT:  OK.  So the table -- what the '122 and
the '216, the claims that are being asserted against Roxane,
those claims talk about how much is dissolved in a certain
period of time no matter what formulation you use.  OK?  And
what they had in the '357 patent, at pages 9 to 10, is a table.
And they made compositions and they put them in a beaker and
they watched them dissolve and they calculated how much
dissolved over a period of time.  That information was the
basis for what they later claim in the '122 and the '216
patents.  So that same table that was in the blue box
application appears in the green box patents, the '122 and the

D9cdendm
                              Motion

1   '216.

2          And if you'll take a look -- if you'll bear with me

3   one more second, your Honor.  If you'll take a look at the next

4   page.  I know I'm going a little --

5          THE COURT:  Page what?

6          MR. CLEMENT:  Page 18.  These are the claims that Endo

7   is asserting.

8          So you'll see Claim 1 of the '122 patent has a bunch

9   of information about that they want to have a controlled

10   release pharmaceutical composition.  But what they're really

11   claiming is that -- at the last couple of lines of that first

12   claim -- about 15 percent to about 50 percent by weight of

13   oxymorphone is released from the tablet at about one hour in

14   the test.

15          Do you see that?

16          THE COURT:  I do.  What is the significance of that?

17          MR. CLEMENT:  Because if you go back to the table that

18   I was just showing you and you look at the time points, you

19   will see that this is the support for what they tried to claim

20   in the '122 and the '216.  At the one-hour time point in the

21   '357 application, they released 27.8 percent and 32.3, which is

22   smack in the middle of 15 to 50.  That's why they carried this

23   through to the '122.  At the one-hour time point it is the

24   same, 27.8 and 32.3.  It is the same example.  It is going to

25   be the same thing for the '250, 27.8 and 32.3.  It is the exact

D9cdendm
                              Motion

1    same example.

2           So they needed this as the basis for their claim to

3    priority, which is the same language that is in the settlement

4    agreement claim to priority.  So there is a direct license,

5    your Honor, between the license agreement that Endo and Roxane

6    entered into and also what is in these patents, these later

7    patents that all of a sudden, as Endo would like you to

8    believe, issued out of thin air.  No, they were based on old

9    things that were also in the '250 patent and applications

10   claiming priority to the '250 patent.

11          If you look at Claim 2 of the '122 patent, there it

12   talks about 45 to 80 percent release at four hours.  We can do

13   the same thing.  In the '357, it is 58 and 66.  The '250

14   patent, 58 and 66.  The '122, 58 and 66.  The '216, 58 and 66.

15   Again, smack-dab in the middle of what they're trying to claim

16   now.

17          The same thing for Claim Three; at least about

18   80 percent at 10 hours.  We can go to the 10-hour number, 85

19   and 90, again, meeting the limitations.  They needed this.

20   They claimed priority to it.  Roxane specifically covered this

21   in its agreement with Endo.

22          So it's not just this form, you know, continuation

23   that's up there in cyberspace or whatever and has no meaning.

24   This has real meaning, your Honor.  There is substance to this;

25   it is not just form.  They claim priority back to the '250

                              Motion

1    patent because if they didn't they would not have been allowed

2    to get their '122 and '216 patents issued.

3            THE COURT:  What about that last statement, Mr. Black?

4            MR. BLACK:  There is a lot of hand waving going on

5    here, your Honor.

6            This issue about which patents were going to be

7    included within the license and which were not going to be

8    included was specifically discussed between the parties.  We

9    have a declaration from Mr. Donatiello stating that he

10   discussed this issue with Mr. Dow, of Roxane.  We have a

11   negotiating history that I would like to refer to in a moment,

12   and that Roxane knew this was an issue and agreed not to get a

13   license to these applications.

14           For him to say that -- by showing a couple of tables

15   next to each other that they somehow got a license, that

16   doesn't change the scope of the Agreement or what the parties

17   were negotiating.  It's completely irrelevant.

18           What is relevant is the analysis he started down the

19   road of, which is looking at the license, looking at the

20   definition of licensed patents, and looking to determine

21   whether or not these new patents are covered by that

22   definition.  The answer is they are not.

23           THE COURT:  Why are they not?

24           MR. BLACK:  If you would look at page 3 of our

25   presentation, your Honor, this presents most of the same

D9cdendm
                              Motion

1    information that Mr. Clement was discussing a moment ago.

2    We've just tried to put it on one page, and hopefully the

3    arrows will help illuminate rather than confuse.

4           But there is a license under -- this is Section 4.1,

5    under the "Licensed Patents."  Contract construction.  What are

6    the licensed patents?  It covers several categories, including

7    B, "Any United States patent applications that claim priority

8    to the Opana ER patents."  That is the key phrase, "priority to

9    the Opana ER patents."

10          THE COURT:  Just a minute.

11          (Pause)

12          Go over the language you were referring to, Mr. Black,

13   again.

14          MR. BLACK:  Sure, your Honor.  The agreement is under

15   the "Licensed Patents."  The licensed patents are defined in

16   1.16, which is the second section there on the page, and what's

17   licensed is patent applications that claim priority to the

18   Opana ER patents.

19          So you have to ask, OK, we'll get to the question of

20   what claiming priority means in a moment, but just so we have

21   everything fixed.  Claim priority to the Opana ER patents, so

22   it's claim priority to Opana ER patents, as defined.  And

23   there's our magical '250 again.  Do you see the '250 patent?

24          THE COURT:  Right.

25          MR. BLACK:  So they have to show, in order to prevail

D9cdendm
                              Motion

1    under a license defense, that the patents at issue today claim

2    priority to the '250.  Claim priority to the '250 because

3    that's what are the Opana ER patents.

4            And what I was saying a moment ago, your Honor, is

5    that this was an explicitly negotiated provision.  It would

6    have been very easy for the parties to write an agreement that

7    said you have a license to all of Endo's patents.  They didn't

8    do that.  They gave a license to certain patents only.  And the

9    only way they can prevail is if they could show that the

10   patents-in-suit now claim priority to the '250, and they can't

11   do that.

12           Now, for him to say that the Agreement is broader --

13           THE COURT:  Why can't they do that?

14           MR. BLACK:  They can't do that because if your Honor

15   will take a look at the page 7, this is the face of the patent.

16   And this is a crucial point, your Honor, which is that there is

17   no uncertainty about which patents are continuations or which

18   patents claim priority to the '250, because the priority

19   information and the continuation information is printed on the

20   face of every patent.

21           So on page 7 we have a cutout of the '122.  I'm sorry,

22   even with the blowup, the writing is a little bit small.  But

23   what it says is that the '122 is a continuation of Application

24   10/190,192.  It doesn't say that this '122 patent is a

25   continuation of the '250.  It doesn't say that.  It is not a

D9cdendm
                              Motion

1    continuation of the '250.  Therefore, they cannot demonstrate

2    that a claims priority --

3              THE COURT:  It doesn't say it is a continuation.  Do

4    they?

5              MR. CLEMENT:  No, we don't, your Honor.

6              MR. BLACK:  That is right.

7              MR. CLEMENT:  We make a claim of common priority.

8              MR. BLACK:  Common priority.  So the next point, your

9    Honor, is that it also says what it claims priority to, and it

10   claims priority to four provisional applications, which are

11   special types of applications that can be filed, which are not

12   complete and don't have to be prosecuted, but the four

13   provisional applications that are referred to are also stated

14   on the face of the patent.  None of those is the '250 patent.

15             THE COURT:  Where are they listed?

16             MR. BLACK:  That's just below the common application.

17   It might be better to look on the right.

18             THE COURT:  I'm looking at the right.

19             MR. BLACK:  OK.  I'm sorry.  I was looking at the left

20   side.

21             This application is a continuation of U.S. patent

22   Application Serial Number '192 and claims priority to U.S.

23   provisional applications, and then it gives four numbers.  It

24   doesn't say the '250 patent.  And the reason it doesn't say it

25   is because that provision was explicitly negotiated by the

D9cdendm
                              Motion

1   parties at the time this agreement was entered into, your

2   Honor.

3            This is not a surprise to Roxane.  I represented to

4   the Court several times that it was negotiated by the parties,

5   and they gave up that right and they only got a license to

6   limited patents.  And there was a discussion with Mr. Dow, and

7   the materials are in our package.  And he hasn't denied it

8   because it was true.  That was the deal.

9            THE COURT:  Do we have those things up here in court?

10           MR. BLACK:  What?

11           THE LAW CLERK:  Which declaration?

12           MR. BLACK:  The declaration of Mr. Donatiello.

13           Yes, it would be paragraph 39.

14           THE LAW CLERK:  Of which one?

15           MR. BLACK:  Let me see.

16           (Pause)

17           39.

18           (Handing to the law clerk)

19           MR. BLACK:  So in paragraphs 38 and 39, your Honor --

20   I'll just let you review those.

21           MR. CLEMENT:  Your Honor, just for the record.  This

22   is parol evidence and I believe it is also hearsay.

23           (Pause)

24           THE COURT:  Who is Mr. Dow?

25           MR. BLACK:  Mr. Dow was the negotiator for Roxane,

D9cdendm
                            Motion

1   your Honor.

2                 THE COURT:  And this declaration is by?

3                 MR. BLACK:  Mr. Donatiello, the negotiator for Endo.

4                 And it is uncontested, undisputed.

5                 MR. CLEMENT:  It was just served on us Tuesday.

6   Mr. Dow is in Germany and has not had a chance to respond.

7                 THE COURT:  How about Actavis?

8                 MR. BLACK:  Actavis doesn't have this common priority

9   language.  There is no ambiguity about their Agreement in any

10  way, shape or form.

11                Their Agreement is on page 2 of our presentation, the

12  relevant provision, and they have only continuations to the

13  '250.  And it is undisputed that the patents-in-suit are not

14  continuations of the '250.

15                THE COURT:  What do you say, Mr. Weiss?

16                MR. WEISS:  Well, a few points, your Honor.

17                First, Endo spoke a lot about the parties, the

18  parties, the parties.  But this evidence of the alleged

19  discussions between Endo and Roxane goes only to Roxane.  That

20  occurred in 2011.  The Actavis license was granted in 2009.

21  And there is no similar information about alleged agreements

22  between Endo and my client.  So I have no idea what the effect

23  is as to Roxane, but there is no similar evidence as to

24  Actavis.

25                As to the second point, continuation or common

D9cdendm

Motion

1   priority, Mr. Black said it is uncontested.  It is not

2   uncontested.

3          And if we could look back briefly?  This is at his

4   slide 7.  He pointed out -- and the language is what it is

5   here.  It is a continuation of this patent application

6   10/190 --

7          THE COURT:  That is page 7?

8          MR. WEISS:  Yes.  This is page 7 of Endo's slides.

9          THE COURT:  Go ahead.

10         MR. WEISS:  OK.  And then it says "and claims priority

11  to," and then it lists the applications it claims priority to,

12  which include the application --

13         THE COURT:  Where are you reading now?

14         MR. WEISS:  I'm in the yellow here.  So do you see

15  where he has underlined "and claims priority to"?

16         THE COURT:  I see that.

17         MR. WEISS:  OK.  And then it says, "U.S. Provisional

18  Patent Application Serial Nos. 60/329,445, filed October 15,

19  2001; 60/329,432, filed October 15, 2001," and then here's the

20  key one, "60/303,357, filed July 6" --

21         THE COURT:  Wait a minute.

22         (Pause)

23         I guess I'm not with you in where I'm reading.

24         MR. WEISS:  Can I --

25         THE COURT:  Is this page 7 of Endo's --

D9cdendm
                              Motion

1              MR. WEISS:  Slides.

2              THE COURT:  And it is in the right-hand box?

3              MR. WEISS:  Correct.  He has the blowup.

4              THE COURT:  And where do you see '357?

5              MR. WEISS:  OK.  It is three lines up from the bottom,

6     in the highlighted portion.  '357 filed July 6, 2001.

7              THE COURT:  Bring me up what you are talking about

8     because I just don't see it.

9              (Pause)

10             MR. WEISS:  It is right here, your Honor.

11             (Indicating)

12             THE COURT:  Oh, I've got a different page.  Oh, no, I

13    don't.  Thank you very much.

14             MR. WEISS:  Thank you.

15             THE COURT:  Now, I didn't see the '357.  What is the

16    significance of that?

17             MR. WEISS:  So that, your Honor, is the ultimate

18    priority application.  This is the one that was in the blue box

19    that was hard to read on page 8 of Endo's slide deck.

20             THE COURT:  I just can't read those boxes.

21             MR. WEISS:  Right.  But that is the '357 application.

22    So that is the --

23             THE COURT:  On the far left?

24             MR. WEISS:  Correct.  That is the ultimate parent with

25    the earliest date and, as Mr. Clement pointed out, is the

D9cdendm
                                  Motion

1   source of the tables and the examples that have the dissolution

2   data that ultimately support the claims at issue here in the

3   new patents.

4              THE COURT:  What does that material on page 7 of

5   Endo's material, what does it have to do with the license

6   issue?

7              MR. WEISS:  Right.  So -- well, there are two

8   different license claims and we've only talked about one.  But

9   there is the claim -- and this is a common claim by both Roxane

10  and Endo -- that there is an express license to the '122 patent

11  and the '216 patent.  These are the new patents that issued in

12  2012 that we are here on today.  And the basis is --

13             THE COURT:  Who claims that?

14             MR. BLACK:  I think you meant Actavis.

15             MR. WEISS:  I'm sorry.  I misspoke.  Thank you.  Sorry

16  about that.

17             Both defendants have an express license claim that the

18  settlement of the earlier case, and the definition of the Opana

19  ER patents, expressly includes the patents we're here on today,

20  '122 and '216, by virtue of the common priority claim through

21  and back to the '357 application filed in July 2001.  It has

22  the exact dissolution data that the current claims depend on.

23             But I would like to raise the other point which we've

24  not spoken about yet today.  This goes back to your Honor's

25  observation where you said that sounds terrible, that you

                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                    Motion

1    litigated the earlier case, you settled, here we are again on

2    the same product.  This is the estoppel -- the license by

3    estoppel issue.

4           The facts of this case, where there is settlement of

5    litigation and then a second lawsuit on new patents, are not

6    unique and is not uncommon.  So we discuss in some detail in

7    our brief a Federal Circuit case from 2009 -- and this is the

8    Transcore case.  It is Transcore v. Electronic Transaction

9    Consultants, 563 F.3d 1271, and I spoke about this case when we

10   were in front of your Honor the last time.  Very similar

11   situation.

12          Settlement of an earlier lawsuit.  A new patent

13   issues, and the patent owner is back at it again.  And the

14   patent owner argued in that case, like Endo argues here, that

15   there is language that says, in the settlement agreement, this

16   doesn't apply to other patents.  The Federal Circuit says that

17   doesn't do it.  You are estoped because that deprives the

18   licensee of the benefit of its bargain.  The subject matter

19   that you licensed to settle in the earlier case did not

20   survive.

21          And, again, that is not a new doctrine.  This is not

22   uncommon estoppel law.  It comes up time and again.

23          There is another case, which is discussed and cited in

24   Transcore, from 1968, from the Court of Claims.  And this is

25   when the Court of Claims heard all their cases en banc.  So

                                    Motion

1    this is counsel's binding Federal Circuit precedent, by the

2    way.  And the citation to this, this is <u>AMP v. United States</u>,

3    389 F.2d 448 (Court of Claims 1968).  The same type of

4    situation.  There is a license agreement between a contractor

5    and the federal government on -- what turns out, they refer to

6    the patents there by name -- the Byrem patent.  That was the

7    man, the employee of the contractor.

8           After that is done, the contractor finds that somebody

9    else, another company, owns another patent that actually

10   dominates the Byrem patent.  And that is referred to in the

11   case as the Vinson patent, V-i-n-s-o-n.  They buy the patent.

12   They didn't own it at the time.  They buy the patent.  They sue

13   the federal government for patent infringement in the Court of

14   Claims.

15          The federal government says we're licensed by

16   estoppel.  But one of the defenses there was, but this Vinson

17   patent we didn't even own at the time, and if we had not bought

18   it you would have no defense, if it was in the hands of a third

19   party.  And the federal government says, yeah, that's right,

20   but you did buy it, and you deprive us of the benefit of the

21   bargain.

22          The Court makes a point there that I think is

23   important to point out.  The pen cite is page 452.  So it is

24   389 F.2d at 452.  And it talks about that the estoppel here is

25   not what it refers to as estoppel in pais; it does not require

D9cdendm
Motion

1    any kind of false representation or trickery or misleading

2    action.

3         Now, what was in Endo's head in 2009, when it settled

4    with Actavis, I don't know, and I don't really care.  What was

5    in Endo's head, its unexpressed intent to Actavis would be

6    irrelevant anyway.  So we don't have to prove bad faith or

7    trickery or anything like that.

8         But, again, the AMP v. United States case says you

9    grant a license.  You get a new patent that covers the same

10   thing.  You can not enforce it.

11             THE COURT:  You what?

12             MR. WEISS:  Can not enforce it on the exact subject

13   matter that you licensed.  This is not a new doctrine.

14             There is another case --

15             THE COURT:  You know, you can't, c-a-n-n-o-t?

16             MR. WEISS:  Can not, yes.

17             There is another case --

18             THE COURT:  All right.  Now, look, we've got to

19   take -- let's take a short break and then come back and I've

20   got to make some rulings.  All right?

21             MR. WEISS:  Thank you, your Honor.

22             (Recess)

23             THE COURT:  We have before the Court a motion for a

24   preliminary injunction by Endo against Actavis and Roxane, and

25   Endo seeks a preliminary injunction on the basis of Patents

D9cdendm
                              Motion

1   '122 and '216.  Now --

2              MR. BLACK:  And '482 with respect to Actavis, your

3   Honor.  I'm sorry to interrupt but there is a third patent.

4              THE COURT:  OK.  We've had a hearing this morning

5   relating to an issue which I thought was pivotal and I still

6   think is pivotal, and that is the question of whether because

7   of licenses or because of circumstances connected with

8   licenses, at least for preliminary injunction purposes, whether

9   Endo can succeed in obtaining a preliminary injunction in view

10  of these license issues.

11             I'm ruling that the preliminary injunction must be

12  denied.

13             Now, I will not adjourn to write a detailed decision.

14  The record is full of the facts that are essential here -- the

15  earlier litigation, the settlement of the earlier litigation,

16  and so forth -- and the details of that I will not try to

17  recite in a bench ruling, because they are well known and they

18  are in the record without having to be repeated by me at this

19  moment.

20             But there was the earlier litigation, and there was a

21  settlement.  And an important part of that settlement was a

22  recognition that a patent with the number '250 was not

23  infringed.  But the parties did not simply leave that in that

24  posture.  There were agreements made which specifically

25  recognized that the products of Actavis and Roxane were not

D9cdendm
                                Motion

 1   infringing, and those products would be permitted.

 2          The status of the products is not simple.  There were

 3   certain products by Actavis either on the market or about to go

 4   on the market.

 5          As far as Roxane, the effort has been to obtain FDA

 6   approval, but that has been a very substantial effort, with a

 7   view towards putting a product or products on the market.

 8          So what emerged from that settlement, or that earlier

 9   litigation, was clearly the right of Actavis and Roxane to

10   pursue the permitting process and the marketing process with

11   respect to the products which all parties understood they were

12   engaged in either marketing or getting permits for.

13          And I emphasize that that settlement led to a

14   substantial effort on the part of Actavis and Roxane in

15   response to that settlement, and the licenses, which were the

16   effect of that settlement.

17          Now, the basis of Endo's claim now is that there are

18   two new patents -- are there three?

19          MR. BLACK:  There are three, your Honor.  One is

20   completely unrelated to any of the others.

21          THE COURT:  Well, the number of the third is what?

22          MR. BLACK:  '482.

23          THE COURT:  So I need to refer to '482, right, as well

24   as to '122 and '216?  Well, if I do, I do.  It is '482?

25          The discussion here this morning has been involved

D9cdendm

Motion

1    with '122 and '216, and I'm not claiming to be greatly informed

2    about '482.  But I assume that, on the licensing issue, it

3    stands along with '122 and '216.

4            MR. BLACK:  It does not, your Honor.

5            THE COURT:  What?

6            MR. BLACK:  It really does not.

7            THE COURT:  What, do we have to have another hearing

8    about '482?

9            MR. BLACK:  No, your Honor.  I understand where you

10   are going.  I just didn't want to -- I just wanted to make --

11   '482 is not in the same family as the '122 and the '216.  It is

12   acquired from another company.

13           THE COURT:  Well, if you want to adjourn for another

14   hearing about '482, make your application now.  Do you want to

15   adjourn for that?

16           MR. CLEMENT:  Your Honor, they've already said it is

17   not asserted against Roxane.

18           MR. BLACK:  That is true; it is not asserted against

19   Roxane, only against Actavis.

20           THE COURT:  Look, the discussion this morning, a very

21   substantial discussion, has been exclusively concerned with

22   '122 and '216, and I am going to talk about '122 and '216, and

23   to the extent that there is any implication needed for '482,

24   the parties can draw that.  But there has been no discussion

25   before me about '482, and I'm not going to discuss it now.

D9cdendm
Motion

1        Let me go ahead.

2        There were two -- and I'm going to refer to two new

3   patents and that's what I'll refer to, because that's what's

4   been discussed all day.

5        MR. BLACK:  We did refer to the '482, and we've moved

6   for preliminary injunctive relief on the '482 against Actavis.

7        THE COURT:  I'll come to that, but my discussion now

8   is going to be about what has been discussed here this morning,

9   very extensively in open court, and that's about '122 and '216.

10  But these are new patents, and the claim is that the products

11  that Actavis and Roxane are either marketing or seeking

12  permission for these products infringe '122 and '216.  And the

13  request for a preliminary injunction is on the basis of that

14  claim of infringement.

15       Now, a great deal of time was spent today on the

16  detailed language of one or more agreements entered into at the

17  time of the earlier litigation and the references to patents

18  and the details of certain patents said to be referred to in

19  those agreements.  And one side claims that applying that

20  language to what is known about certain patents, Endo claims

21  that that shows that there was no intent to license or give any

22  permission to market products or seek permission of anything

23  that would infringe '122 and '216.

24       The other side claims that if you examine the

25  agreements in the earlier litigation, the agreement language,

D9cdendm
                            Motion

1    and you analyze it carefully in view of what is known about

2    certain patents, that it will show that there was no intent to

3    project any possibility of litigating infringement about '122

4    and '216, and then, indeed, the licenses and permissions are

5    broad enough to cover '122 and '216.

6          I wish to say for the record that I do not feel, for

7    purposes of a preliminary injunction motion, that I am able to

8    make any findings on the issues that I have just described, and

9    I want to make it clear that that's exactly where I stand.  I'm

10   not saying that the plaintiff has not sustained its burden of

11   proof, and I'm not saying that the defense has not sustained

12   whatever burden they need to sustain.  I am simply not able to

13   make any findings on the issues which I have just described.

14   Probably my description is not artful, but I think the lawyers

15   here know exactly what I'm talking about.  In my view, a much

16   more substantial hearing and, indeed, a full trial would be

17   necessary to fully explore what is involved in the issues I am

18   talking about now.

19         What is clear, however, to me is this.  That an

20   agreement was made, and whether it's called a license agreement

21   or an agreement not to sue I won't worry about for the moment.

22   We'll call it a license agreement because that's how things

23   have been described by the lawyers today.  We're talking about

24   licenses.

25         And what is clear is that those licenses, or that

D9cdendm
                                Motion

1    license, gave permission to Actavis and Roxane to go forward

2    with marketing the products and seeking permission for the

3    marketing of the products that have been the subject of their

4    activity since the time of the litigation up to and including

5    the present moment.

6            There is a doctrine bearing the name estoppel, and

7    there's case law about the problem we have here.  And that is

8    where a license is given, or permission is given, or where for

9    any other reason it is legal for a company to market a product

10   and such marketing is done and then another company comes in

11   with new patents and says you infringe my new patents, under

12   the circumstances that we have here, which may be different

13   from other circumstances, but under the circumstances that we

14   have here that is a highly unfair and unjust situation if that

15   were to be -- if infringement of the new patents would stop the

16   marketing and permitting process that was going on by Actavis

17   and Roxane.

18           Consequently, I am holding as a matter of law and I'm

19   finding that Endo is estopped from claiming that the activity

20   of Actavis and Roxane, which has gone on for a substantial

21   period of time, is now suddenly barred because of these new

22   patents.  For those reasons, the motion for a preliminary

23   injunction is denied.

24           And I will submit -- I will sign an appropriate order

25   prepared on notice.  Thank you very much.

D9cdendm
                                   Motion

 1           MR. BLACK:  Your Honor, one last thing.  I'm sorry.

 2           THE COURT:  OK.

 3           MR. BLACK:  I understand the ruling and the question

 4    is where do we go from here?  We ask for leave to have seven

 5    days to file an emergency appeal with the Federal Circuit and

 6    let the status quo be maintained in the interim either by

 7    agreement with the defendants or, if necessary, by application

 8    to your Honor.

 9           MR. WEISS:  We would not agree to that, your Honor.

10    And Endo has had a de facto TRO since we were before your Honor

11    on, I think, August 26th, and Actavis was ready to go then.

12    And to allow the Court the opportunity to have briefing and

13    hearing on this issue, which the Court thought could be

14    dispositive and which the parties agreed would make sense, the

15    company did not start selling its product.  Now --

16           THE COURT:  What is your calendar -- your company's

17    calendar now?

18           MR. WEISS:  They are ready to go today.

19           And we were ready to go a month ago, or three/four

20    weeks ago.  And there was never an application made by Endo for

21    a TRO.

22           And to now ask for -- I mean, there is nothing to

23    stay.  It's not as if the Court granted an injunction and I

24    asked for a stay.  There is nothing --

25           THE COURT:  Let me just ask to backtrack.

D9cdendm
                            Motion

1           The lawsuit was filed when?

2           MR. WEISS:  In 2012.

3           THE COURT:  All right.  And is it correct that by

4    virtue of the circumstances that existed as time went on, it

5    was agreed that the first thing to be heard was the preliminary

6    injunction motion; is that right?

7           MR. WEISS:  Mostly what was agreed, your Honor, after

8    Endo filed the preliminary injunction motion --

9           THE COURT:  When did they file it?

10          MR. WEISS:  August 6th --

11          THE COURT:  All right.

12          MR. WEISS:  -- or 5th.

13          What was agreed when we had a conference in front of

14   your Honor the day that we filed our opposition papers, which I

15   believe was August 26th, that Monday, what was agreed was that

16   it would make sense to go forward at that point on the license

17   issue.  Your Honor commented, well, why is this a preliminary

18   injunction, validity just needs a trial, and your Honor

19   suggested that the license issue could be dispositive at least

20   for a preliminary injunction.  And the parties agreed that that

21   made sense.

22          And we had the hearing in chambers, because there were

23   strangers in the room and there was some confidential

24   information.  And I mentioned to your Honor that we had been

25   waiting.  And you said, well, give notice if you're going to

D9cdendm
                                Motion

1   launch.  We can work all night if we have to.  And be

2   reasonable.  And don't agree to a briefing schedule that you

3   can't live with.  So we agreed to this briefing schedule for

4   hearing the license issue.

5            And Endo, you know, has known about this.  We've had

6   final approval from the FDA since July.  And there was no

7   motion for a TRO filed.  Endo has not even answered our

8   invalidity case.  They could have.  They could have.  They did

9   not.  They chose to go forward just on this also.  They were

10  not prohibited from answering that.  And they never made an

11  application for a TRO.

12           And so to now ask for a TRO without an application

13  having been filed, with what we think is a compelling lack of

14  irreparable harm shown in our papers -- now, your Honor has not

15  considered that, I know, because we were doing the license

16  issue -- to ask for a TRO now, to wait until the PI is denied

17  and ask for the first time for a TRO, without bond, without

18  security, is not right.  And so we would not agree to that,

19  your Honor.

20           THE COURT:  Look, let me just say this.

21           As Mr. Weiss says -- and the record certainly shows --

22  I felt, after hearing about the issues quite extensively, I

23  felt that the license issue was a threshold issue, and that if

24  the defense won on the license issue, that would be grounds in

25  and of itself for denying a preliminary injunction.

D9cdendm
                              Motion

1           I did not know at that time how that would come out.

2    Obviously, if it would come out differently, we would have gone

3    on to the hearing on invalidity and so forth.  However, I have

4    ruled as I've ruled.

5           Endo has a right to appeal from a denial of a

6    preliminary injunction, and they certainly have said that they

7    will do that, and that is their right.

8           If I deny -- the request basically is -- I think

9    you're right -- I haven't granted any affirmative relief, so it

10   isn't a matter of staying affirmative relief, it's really to

11   grant for the first time a restraint, which I have not granted

12   before and I don't think has even been requested of me.  Now

13   for the first time, after this ruling, there is a request for a

14   restraint, and one could call it a temporary restraining order,

15   I suppose.

16          MR. BLACK:  May I say something, your Honor?

17          THE COURT:  Yes.

18          MR. BLACK:  What we're seeking is leave to appeal, to

19   the extent it is necessary.  I think it probably -- leave is

20   not probably necessary because a denial of a preliminary

21   injunction is appealable, and also that we maintain the status

22   quo for one week so that we can file our appellate papers and

23   let the Federal Circuit hear the issue before the status quo is

24   changed.

25          Up until now there has been no need for a TRO because,

D9cdendm
                              Motion

 1    by agreement of the parties and by informal instruction by your

 2    Honor in chambers, there had been no launch.  The question now

 3    on a TRO is whether or not, using the four-factor test, the

 4    irreparable harm and the other factors involved, and looking at

 5    an injunction, whether keeping the status quo in position for

 6    one more week, when they filed this FDA request five years

 7    ago -- five years ago they applied to sell these dosage

 8    strengths -- the question is whether or not we should have one

 9    more week of --

10            THE COURT:  I don't understand why it's only one week.

11    Maybe I don't understand your application.

12            MR. BLACK:  We are going to file a motion for

13    expedited appeal, your Honor, also.  We want a --

14            THE COURT:  But are you asking me to stay their

15    marketing pending --

16            MR. BLACK:  Yes, your Honor.

17            THE COURT:  -- the outcome of the appeal?

18            MR. BLACK:  Pending the outcome of the appeal, yes,

19    your Honor, we have to request that, and, secondarily, pending

20    the outcome of the Federal Circuit decision on an expedited

21    motion to maintain the status quo.

22            THE COURT:  I am a little confused about what you --

23            MR. BLACK:  We have two requests, your Honor.  The

24    first request is to stay your Honor's decision and maintain the

25    status quo through the conclusion of an expedited appeal.

D9cdendm
                                   Motion

1         THE COURT:  And what is the second application?

2         MR. BLACK:  The second application would be to

3  maintain the status quo for long enough for us to get our

4  papers on file and a motion for a restraining order with the

5  Federal Circuit to decide it, which would be a couple of weeks.

6         THE COURT:  Well, back to you, Mr. Weiss.

7         MR. WEISS:  So the application, I mean, we're talking

8  about maintaining the status quo.  There is really no such

9  thing that exists in the rules.

10        What the application is, it's an application for an

11  injunction pending appeal.  And that can be granted by your

12  Honor, it could be granted by the Circuit Court.  But it is

13  effectively asking for a TRO when none was requested.  And it

14  certainly must be a higher standard than staying an injunction.

15  To stay an injunction there must be a finding of a likelihood

16  of success on the merits above, at the Circuit Court, plus the

17  other factors.  And there has been no such showing made here.

18        And so an injunction pending appeal after the

19  preliminary injunction was denied and when no application for a

20  TRO was ever made, the standards are not remotely met.

21        It should be denied.  If they want to make the

22  application to the Circuit Court, they certainly can.  I think

23  that will be denied, but I'm not, you know, in a position to

24  predict what the Circuit Court will do.

25        But there was no application.  The standard is not

D9cdendm
                              Motion

1    met.  The irreparable harm is not shown.  The irreparable harm

2    that was argued in their brief was four or five generics.  What

3    we're talking about here are two, Actavis and Roxane.  I don't

4    know if Roxane is ready to go or not, they are not my client.

5    I can speak only for Actavis.

6              THE COURT:  What does Roxane say about this?

7              MR. CLEMENT:  Roxane doesn't believe there is any need

8    for a stay pending appeal.  Roxane has told Endo that they

9    would give 30 days notice of any launch.  We have not yet given

10   that notice, although Roxane would like that right to give it

11   tomorrow should they desire.

12             I don't think that there are grounds for this

13   injunction pending appeal for precisely the reasons

14   Mr. Weiss -- I mean, Actavis is out there already selling

15   product on two of the strengths.  They have been selling it for

16   a number of years.  Are they saying that Actavis -- what are

17   they saying?  There are impasses out there.  There are a number

18   of generics already out there.  I mean, usually something like

19   this is done when there are no generics out on the market and

20   they are afraid to upset the apple cart.  This is not the

21   situation here.

22             THE COURT:  Well, it seems to me the way to maintain

23   the status quo is to maintain the status quo, and that means

24   that the products that we discussed here, some of them have

25   been marketed, others will be added to the marketing, but

D9cdendm
                              Motion

1    that's the status quo, and so any further order by this Court

2    is denied.

3             All right.  Thank you.

4             MR. CLEMENT:  Thank you, your Honor.

5

6                            -   -   -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25