D8QFENDA

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     ENDO PHARMACEUTICALS, INC.,
 3
                   Plaintiff,
 4
               v.                            12 CV 8985 (TPG)
 5
     ACTAVIS INC.,
 6
                   Defendant.
 7   ------------------------------x
     ENDO PHARMACEUTICALS, INC.,
 8
                   Plaintiff,
 9
               v.                            13 CV 3288 (TPG)
10
     ROXANE LABORATORIES,
11
                   Defendant.
12   ------------------------------x
                                             New York, N.Y.
13                                           August 26, 2013
                                             2:45 p.m.
14   Before:

15                    HON. THOMAS P. GRIESA,

16                                           District Judge

17                         APPEARANCES

18   DECHERT LLP
          Attorneys for Plaintiff
19   ROBERT D. RHOAD, ESQ.
     MARTIN J. BLACK, ESQ.
20
     HOLLAND & KNIGHT
21        Attorneys for Defendant Actavis
     CHARLES A. WEISS, ESQ.
22   ERIC H. YECIES, ESQ.

23   LOCKE & LORD
          Attorneys for Defendant Roxane Laboratories
24   ALAN B. CLEMENT, ESQ.
     KEITH D. PARR, ESQ.
25   EMILY LARRIMER SAVAS, ESQ.
```

D8QFENDA

1                (Case called)

2                (In open court)

3                THE DEPUTY CLERK:  Case of Endo Pharmaceuticals v.

4      Actavis Inc. and Roxane Laboratories.

5                THE COURT:  All right, what do we need to do today?

6                MR. BLACK:  Thank you, your Honor.  Martin Black for

7      Endo.  We really have two issues.  The overall issue is setting

8      a schedule for the disposition of the preliminary injunction

9      motion that we filed to maintain the status quo pending trial.

10     Actavis and Roxane have obtained FDA approval and have the

11     ability therefore to launch a generic product before the trial

12     would be held.  We had presaged this issue at the conference we

13     had back in June, I guess it was, and we filed our papers and

14     the parties are cooperating on discovery, but we all thought

15     that it would be beneficial to get a date certain for a hearing

16     and take your Honor's pleasure on how such a process should

17     unfold when the hearing would take place.

18               THE COURT:  When you talk about a preliminary

19     injunction hearing and a trial, why would you have both of

20     them?

21               MR. BLACK:  The preliminary injunction hearing would

22     be obviously for maintaining the status quo until there's a --

23               THE COURT:  Usually a preliminary injunction hearing

24     gets pretty deeply into the thing.

25               MR. BLACK:  It does, your Honor, and obviously it's

D8QFENDA

somewhat abbreviated compared to a full trial.  But the

difficulty we have is that the defendants are insisting on

their right to launch the product before the Court can have a

full trial, which would take some time.  These cases are in the

very early discovery stages.

THE COURT:  A little louder, please?

MR. BLACK:  I'm sorry.  These cases were filed a

little earlier this year.  We just worked out the protective

order.  Discovery has just begun.  I don't think the parties

are prepared for a full trial on the merits.  Our purpose in

bringing the motion is to preserve the status quo pending a

trial.  Defendants are not agreeable to that, and therefore we

have no choice but to bring a preliminary injunction motion.

THE COURT:  What are the issues to be dealt with at

the motion or the trial?

MR. BLACK:  For a preliminary injunction we would need

to establish the plaintiff's infringement and irreparable harm.

We bear those burdens.

THE COURT:  I know.  But that's generalities.  What

are the specific issues here?

MR. BLACK:  Okay.  The specific issues on

infringement, doesn't look like there's going to be any.  Looks

like infringement is not going to be disputed.  They're

disputing the validity of the patents.  They're disputing that

if they launch into the market it will be irreparable harm to

D8QFENDA

1    Endo.  Our view is when a generic launches against a branded

2    company that the eggs are cooked and it's impossible to

3    unscramble them.

4                THE COURT:  What are the issues about validity?

5                MR. BLACK:  On validity we believe there really isn't

6    a serious issue, your Honor.  Two of the patents were --

7                THE COURT:  You believe what?

8                MR. BLACK:  I don't believe there's a serious issue.

9    Two of the patents -- they will disagree, of course, but two of

10   the patents have already been to the Federal Circuit.  One of

11   the patents, the Patent Office -- I'm sorry, am I too far away?

12               THE COURT:  Why don't you sit down?  These are very

13   awkward microphone arrangements.  I'll hear you better.

14               MR. BLACK:  Thank you, your Honor.  Two of the patents

15   are from a family which was issued recently and the validity of

16   those patents was debated in the Patent Office and went up to

17   the Federal Circuit which ruled in our favor so we have a

18   Federal Circuit decision affirming the validity of one of the

19   patents and then shortly after that a related patent in the

20   same family issued as well.  There's a third patent which is --

21               THE COURT:  Patent for what -- what are you patenting?

22               MR. BLACK:  Sure, your Honor.  The product at issue in

23   this case is an opioid.  It's called oxymorphone.  It's similar

24   to OxyContin.  It's a strong narcotic available only by

25   prescription and it's a Schedule II controlled substance.

D8QFENDA

 1    There was an original round of cases relating to this product.

 2    Endo then came up with an approved product which is a

 3    crush-resistant formulation.  One of the issues which these

 4    products, like oxymorphone and oxycodone, is that they are

 5    attractive to drug abusers.  They can be purchased, crushed and

 6    then snorted and the industry has been working on ways to

 7    provide safer products to the public.

 8           Endo came up with a crush-resistant formulation,

 9    launched that product and then removed the earlier crushable

10    version from the market.  The patents at issue cover, in this

11    proceeding, cover two things.  One is the dissolution rates and

12    pharmacokinetic characteristics, that is, how the drug gets

13    distributed in the blood and what the effect is on the patient

14    and the third one is a patent relating to impurities.  There's

15    a cancer-causing product in oxymorphone generally and there are

16    ways of getting rid of the cancerous impurity and the patent

17    relates to that.

18           Those are the basic issues related to the patents.

19    There are, of course, going to be issues relating to

20    irreparable harm and Actavis has raised an issue of license

21    relating to the prior litigation and whether they have

22    expressly or impliedly obtained rights to the patents not

23    listed in the agreement.

24           THE COURT:  What went before the Federal Circuit?

25           MR. BLACK:  There was a prosecution going on in the

D8QFENDA

1    Patent Office of one of the Endo patents that is at issue here.

2              THE COURT:  Which Endo patent?

3              MR. BLACK:  The patent was -- there's two patents.  I

4    want to make sure I give you the right number.  It's the '122

5    patent which relates to the pharmacokinetic characteristics.

6              THE COURT:  '122 patent is about what?

7              MR. BLACK:  It's about the way in which the product,

8    for want of a better word, dissolves in the blood and how long

9    it remains active in the body.

10             THE COURT:  That's the '122 patent.

11             MR. BLACK:  It might be better -- it's an extended

12   release formulation as opposed to -- many drugs you take them,

13   they have a half life, they go out of the body, are no longer

14   effective within a couple of hours.  There are ways to make

15   them last for longer periods of time.  That's the practical

16   impact of the drug.

17             THE COURT:  And what is the other patent?

18             MR. BLACK:  The related patent to the '122 is the

19   '216.  They have very similar claims and they're from the same

20   family, and then the third patent I mentioned about the

21   removing impurities from the patent, from the oxymorphone is

22   the '482.

23             THE COURT:  Removing --

24             MR. BLACK:  It covers a version of oxymorphone with a

25   low, it's called a low abuk, a-b-u-k, an impurity which has

D8QFENDA

1   been found to cause cancer.

2          THE COURT:  So it's about the removing impurities or a

3   low level of impurities?

4          MR. BLACK:  Low level of impurities.  It's a compound

5   which has a very low level of impurities and the patent

6   describes how to make so-called low abuk oxymorphone.

7          THE COURT:  And all these things are about

8   oxymorphone?

9          MR. BLACK:  Yes.

10         THE COURT:  And that's your client's product?

11         MR. BLACK:  Yes.

12         THE COURT:  How do you spell that?

13         MR. BLACK:  O-x-y-m-o-r-p-h-o-n-e.

14         THE COURT:  Now, what happened in the Federal Circuit?

15         MR. BLACK:  The Patent Office did not grant the patent

16   application that Endo had filed.  Endo appealed to the Federal

17   Circuit from the Patent Office decision and the Patent Office,

18   the Federal Circuit overturned the Patent Office decision and

19   concluded that the Patent Office erred in failing to issue the

20   patent.

21         In front of the Patent Office and the Federal Circuit

22   at that time was a tremendous amount of prior art that had come

23   to the surface during prior litigation and we doubt that there

24   are going to be any new issues.

25         THE COURT:  What do you mean prior litigation?

D8QFENDA

| 1 |          MR. BLACK:  There was prior litigation with some of

2    the defendants in this case on the early non-crush -- the

3    crushable product which we've taken off the market and there

4    was litigation over that product and during the course of that

5    litigation the defendants raised a lot of prior art, all of

6    which Endo provided to the Patent Office and still obtained the

7    '122 and '216 patents.

8          THE COURT:  Well, I don't -- then what are the issues

9    to be heard at a preliminary injunction hearing?

10         MR. BLACK:  At the moment there are -- at the moment

11   the defendants are -- Roxane is not selling this product,

12   although they have recently obtained FDA approval and can do

13   so, unless there's a court order or an agreement to maintain

14   the status quo during trial.  Actavis has been selling two

15   small dosage strengths which have virtually no market share but

16   they now would like to expand into dosage strengths which are

17   the big sellers and would cause serious harm.

18         THE COURT:  What products are they selling?

19         MR. BLACK:  They want to sell the original crushable

20   oxymorphone product.

21         THE COURT:  Who wants to do that?  Both defendants?

22         MR. BLACK:  Correct.

23         THE COURT:  So the defendants want to sell what?

24         MR. BLACK:  Call it crushable oxymorphone.  Generic

25   versions of the crushable oxymorphone.

D8QFENDA

1          THE COURT:  Do I have this right?  They want to sell a

2     crushable version of oxymorphone.

3          MR. BLACK:  Correct.

4          THE COURT:  Both defendants want to do that.

5          MR. BLACK:  Correct.

6          THE COURT:  So what is there to be heard at a

7     preliminary injunction hearing?

8          MR. BLACK:  The questions would be whether or not

9     given the four-factor test of likelihood of success on the

10    merits, irreparable harm, public interest and potential harm to

11    the defendants, whether the factors balance in favor of issuing

12    a preliminary injunction that would maintain the status quo --

13         THE COURT:  Look.  Please don't give me those topics.

14    What are the specific factual issues to be dealt with at

15    preliminary injunction hearing?

16         MR. BLACK:  Whether they have raised a sufficient

17    issue of validity on the patents to defeat our claim for

18    relief.  We only received their papers a couple of hours ago,

19    so I'm not in a position to really go through what pieces of

20    prior art they're referring to or not.  But that's the issue.

21    That's the issue.

22         THE COURT:  In other words, the preliminary

23    injunction, the validity depends on prior art, right?

24         MR. BLACK:  Right.  There's an issue with Actavis

25    about whether they have a license which would give them the

D8QFENDA

     1    right to sell, and then there's the issue of irreparable harm

     2    which turns primarily on what the impact would be on the

     3    marketplace and whether we can put the eggs back together after

     4    they've been broken and scrambled and after a trial if the

     5    plaintiff were to prevail.

     6            THE COURT:  Okay.  What do the defense say are the

     7    issues to be heard at the preliminary injunction hearing?

     8            MR. WEISS:  Thank you, your Honor.  Just out of habit

     9    maybe I'll just stand up and then sit down.  It's Charles

    10    Weiss, W-e-i-s-s, for Actavis.

    11            THE COURT:  Okay.

    12            MR. WEISS:  Mr. Black has identified the legal

    13    standards and if the Court would indulge me I would get into

    14    some of the specific facts that are presented here and the

    15    specific legal issues.

    16            THE COURT:  Okay.

    17            MR. WEISS:  I'm going to start with the prior

    18    litigation.  So Endo sued Actavis in the District of New Jersey

    19    in 2008 on the exact product that is the subject of this case.

    20    The Court knows that a generic company that wants to sell files

    21    an ANDA, the abbreviated new drug application.  Actavis filed

    22    its ANDA in 2008, as did many other companies, including Roxane

    23    represented by my colleagues behind me, Watson Barr, which is

    24    now Teva; Sandoz, which is part of Novartis, Mallinckrodt -- I

    25    may have missed one.  In any event, Endo settled with everyone

D8QFENDA

1    in 2009 including my client Actavis.  They granted Actavis a

2    license and a covenant not to sue on the patents that were in

3    that litigation and related patents.  Under that license

4    Actavis entered the market with two of its strengths, which

5    Mr. Black referred to, this is the 7.5-milligram and the

6    15-milligram, in June 2011.  That's when we were licensed to

7    enter on those strengths.  Everyone else was licensed to enter

8    in 2013, and Impax in fact entered and began selling all the

9    other strengths, this is 5, 10, 20, 30, 40 and so on, in

10   January 2013.  We were allowed to sell beginning 2013 also and

11   we got our final approval from FDA in June, or perhaps July.

12   In any event, this summer of 2013.  And we want to sell the

13   other strengths of the product that we're already selling, and

14   that we are licensed to sell.

15           Now, there's no dispute that it's the same product.

16   They pled that it's the same product in their complaint.  The

17   license issue is where Endo says well, wait a minute, after we

18   settled that lawsuit we continued prosecution and we got two

19   more patents and even though we licensed you, you're not able

20   to practice your license and essentially they're saying the

21   consideration was illusory.  So Endo bargained to keep Actavis

22   off the market until 2013 in settlement of that case.  They got

23   certainty.  Both sides avoided the risk.  Endo avoided the risk

24   that the patents would be held invalid or non-infringed and

25   that Actavis would launch in 2009 or 2010.  And Actavis of

D8QFENDA

1    course avoided the risk that it would lose entirely and would

2    be enjoined until the patents expired.  Typical settlement of a

3    patent infringement case or any other civil case.

4            Here we are in 2013 with Endo saying --

5            THE COURT:  You're saying that the issue of validity

6    was settled?

7            MR. WEISS:  Not as to these patents, your Honor, no.

8            THE COURT:  Not as to what?

9            MR. WEISS:  Not as to the patents that Endo is

10   asserting now.  But all of the patents are licensed.  Valid or

11   not, it doesn't matter, they're licensed.  And so here we are

12   in 2013 with a license that says you're allowed to enter with

13   the other strengths in 2013 and Endo is saying you can't enter

14   in 2013 because we got new patents.  Now, Endo's position is

15   those patents are not within the scope of the license.  That is

16   primarily, if not exclusively, a legal issue.  It is four or

17   five pages of our brief.  It is one document which is the

18   license agreement which is in front of the Court and it is very

19   nicely captured in a single Federal Circuit decision which is

20   in our brief also, I have copies to hand out if the Court

21   wants, it's TransCore LP v. Electronic Transaction Consultants

22   Corp., 563 F.3d 1271, Federal Circuit 2009, dead on factually

23   to this case.  Settlement of an earlier litigation, grant of a

24   license and covenant not to sue, a new patent issues to the

25   patent owner, the patent owner says nope, you can't sell the

D8QFENDA

product that was licensed, summary judgment by the district

court in favor of the accused infringer who had the license,

affirmed by the Federal Circuit as a matter of law.  A licensor

cannot pull the rug out from under its licensee on the exact

product.

          Now, we only brought our papers in this morning so

obviously the Court has not had a chance to look at them, but

that is the license issue.  We could easily file tomorrow a

four-page summary judgment brief on that and motion.  That is

the license issue.

          The validity issue is --

          THE COURT:  I don't understand what is the license

issue?  There are new patents, right?

          MR. WEISS:  Yes, your Honor.

          THE COURT:  And can't they claim -- don't they have

rights under their new patents?  I just don't understand what

you've gone into.

          MR. WEISS:  Of course, your Honor.  They have rights,

but among the things that a patent owner can do is grant

licenses.  And the law says when you settle a litigation and

grant a license for a product, which is what happened in 2009

in settlement of the District of New Jersey case, you cannot

come back years later when you've gotten a new patent and say

that the exact product that you licensed can't be sold because

it infringes.  It's an illegal estoppel.  And that is --

D8QFENDA

1           THE COURT:  The crucial thing I think you're saying is

2      the exact product.

3           MR. WEISS:  Correct.  And I can answer that, your

4      Honor.  So the licensed product was defined in the license

5      agreement as -- and the license agreement is in the papers we

6      delivered.  I can hand up extras if your Honor wants.  It was

7      defined as the Opana ER generic product, which means any

8      product that is marketed and/or sold under the Actavis ANDA.

9      That's a defined term also.  Actavis ANDA says -- ANDA number

10     79-046 and any amendments or supplements thereto -- the

11     remaining strengths of the same product that are at issue now

12     on this preliminary injunction and this lawsuit come from this

13     exact ANDA by number, and that is actually pled, correctly so,

14     by Endo.  Now, Endo says the patents that we're asserting here

15     are not licensed, but it does not dispute that the product at

16     issue before the Court is otherwise licensed.  And then we get

17     into the estoppel issue which is addressed in the TransCore

18     case that I cited.

19          Now, I don't think that there is parol evidence that

20     would negate this, but I don't know, and as Mr. Black said as I

21     acknowledge we only delivered our papers this morning.  But

22     this is a straightforward issue that is separate and apart from

23     potentially complicated issues of patent validity.

24          Now, on the issue of patent validity Mr. Black said

25     that there was an adjudication by the Federal Circuit.  He then

D8QFENDA

1    clarified -- and I think this is very important so I'm going to

2    repeat it.  This was part of ex parte prosecution.  This was

3    Endo v. the examiner.  This was not litigated, these patents

4    were not litigated and the issue in front of the Patent Office

5    was the extent to which the experience with other narcotics

6    could be applied to oxymorphone.  So as Mr. Black mentioned

7    oxymorphone is a narcotic pain killer.  Products were already

8    on the market, extended release narcotic painkillers; MS

9    Contin, which is morphine, OxyContin, which is oxycodone, same

10   family of molecules, all opiates, all going from immediate

11   release to sustained release.  The claims were rejected by the

12   post office and the examiner had in front of him only some

13   information about the products that were out there.

14           So what Endo said was, well, you can't equivalently

15   make oxycodone and oxymorphone because they have different half

16   lives, but MS Contin wasn't there, and MS Contin morphine has

17   almost the same half life as oxymorphone.  And similarly, they

18   said, well, the dissolution testing in the prior art was

19   paddles v. baskets and you don't know how they match up.

20           Well, this is a real simple issue.  Dissolution

21   testing, you have a beaker with fluid in it --

22           THE COURT:  What you're saying is there was prior art

23   which makes what their new patents invalid or what?

24           MR. WEISS:  Yes, your Honor.  And I can explain it --

25           THE COURT:  And the patents that were at issue on the

D8QFENDA

1   license, are you saying those are invalid too?

2           MR. WEISS:  No.  There's no dispute we're licensed

3   under those, those patents are licensed in this lawsuit.

4           THE COURT:  It's the new patents.

5           MR. WEISS:  Yes, your Honor.

6           THE COURT:  Prior art.

7           MR. WEISS:  And there's also a 112 defense, but if I

8   could have a moment to finish the prior art if the Court would

9   indulge me.

10           THE COURT:  Sure.

11           MR. WEISS:  The claims at issue go to how fast the

12   claims dissolve in a beaker.  This is a common test for

13   extended release drugs.  You take a beaker on the lab bench,

14   you fill it with fluid, you put the tablets in and you stir it

15   and you can stir it either with paddles, it looks like a fan

16   sort of, or you can put the tablets in a little basket and spin

17   the basket.  And so one is called a paddle method and one is

18   called a basket method.  And the data that the patent examiner

19   had that he was relying on was basket method.  One of their

20   claims say paddle method.

21          Endo says, well, we don't have the information,

22   Mr. Examiner, for you to extrapolate from one to the other.

23   Well, we have the information.  It's in the Hanson handbook

24   that's attached to Dr. Kibbe's declaration, it's explained in

25   Dr. Kibbe's declaration and what Dr. Kibbe did in his

D8QFENDA

1   declaration is simply show how the dissolution rate of the

2   prior art products and patents, MS Contin itself falls right

3   within the ranges that Endo claims, including within the ranges

4   in the previous patent that was litigated against us.  That's

5   prior art.

6          So it all comes together.  And I have extra copies if

7   the Court wants to see how the charts look.  What I'm holding

8   up is from the Kibbe declaration starting at page 41.  So

9   that's the prior art issue.

10          The Section 112 issue, something I know the Court has

11   some familiarity with, the first patent trial I did was in

12   front of your Honor on human growth hormone, and the patent

13   claims here are directed to every formulation that dissolved at

14   a certain speed.  It doesn't matter how you make it.  It

15   doesn't matter if it's made with coating, or a matrix or beads

16   or osmotic pump, or gum, it doesn't matter.  Anything that

17   works, anything that dissolves at that rate they claim.  That

18   was certainly not in front of the Court before, an ex parte

19   prosecution.  And the law is very clear that you cannot

20   describe a product structurally, which they did in their

21   specification, they have a couple of examples made with gum,

22   and then claim every other product, no matter how it's made,

23   that does the same thing.  And that's discussed in our brief at

24   page 18 and 19.

25          So factually those are the particular issues that

1     would be in front of the Court on validity, whether it would be

2     at a preliminary injunction or trial or whether it would be a

3     consolidated proceeding, this is a bench trial, there's no

4     jury.  And so factually, those are the particular issues.

5             There's also this low impurity patent that Mr. Black

6     mentioned which is in a different family.  The license issue is

7     the same.  There's the estoppel against blocking the very

8     product you've licensed.  That patent didn't even come out of

9     Endo.  That was done by a British pharmaceutical company and

10    Endo bought it to try to now control the raw material.  So we

11    may be developing some interesting defenses down the road about

12    that, but at the moment that's not what we're focusing on.  The

13    thing there that's interesting, not disclosed, is that what

14    that English company did, it's called Johnson Matthey, claimed

15    what FDA had already said it was going to set as the standards.

16    So as Mr. Black noted, information developed at this particular

17    impurity, it's called the abuk impurity, A-B-U-K, alpha beta

18    unsaturated ketone, the chemistry doesn't really matter,

19    potentially could damage DNA and materials that potentially

20    damage DNA could potentially cause cancer.  Because if the DNA

21    is damaged the cell could possibly become cancerous.  That was

22    known around 2002, and FDA contacted manufacturers, contacted

23    stakeholders, said we're going to implement regulations to

24    limit the amount of the abuk impurity.  And as the

25    conversations developed FDA said we're going to limit it to ten

D8QFENDA

1    parts per million.

2            After that happened, Johnson Matthey filed a patent

3    application claiming, guess what, abuk was less than 10 parts

4    per million.  Interesting fact not in front of the Patent

5    Office.

6            Now, similarly, another manufacturer and I'm not

7    saying they should be proud of this, another manufacturer did

8    the same thing Johnson Matthey did except they did it nine

9    months sooner.  And their application, whether it's valid or

10   not doesn't matter, is prior art to Endo nine months earlier

11   and that is an interference in the Patent Office and the Patent

12   Office has already declared Endo the junior party, meaning that

13   it needs to get behind that application.  Now, whether Endo

14   will or will not, at the moment we don't know, but for a

15   preliminary injunction we don't have to know.  All we have to

16   know is substantial question of validity and we have it here

17   big time.  So factually those are the substantive patent law

18   issues.

19           As Mr. Black correctly noted for a preliminary

20   injunction there's also the question of irreparable harm.  Endo

21   needs to show that by clear and convincing evidence.  And,

22   number one, the fact that they demonstrated a willingness in

23   2009 to license the entire generic industry to enter in 2013

24   negates irreparable harm as a matter of law.  The fact that

25   they got some extra patents later on and changed their mind

D8QFENDA

1    does not create irreparable harm.

2              The other thing which Mr. Black noted, he talked about

3    the crush-resistant product that Endo sells now.  Well, that's

4    a separate lawsuit.  It's also in front of your Honor.  Same

5    cast of characters, but that's not what we're here about today.

6              THE COURT:  Okay.  Any other attorney want to talk

7    about the issues?

8              MR. CLEMONT:  Your Honor, Alan Clemont for Roxane.  We

9    haven't had a chance to speak up yet.

10             THE COURT:  Go ahead.

11             MR. CLEMONT:  Thank you, your Honor.  We're in a

12    somewhat similar position to Actavis, though not quite.  The

13    case against Actavis started much earlier.  The case against

14    Roxane has just started in June and we filed our answer in

15    mid-July and Endo just a couple of weeks ago filed a reply so

16    we have not, our case has not even really begun.

17             With regard to whether or not there is the right to a

18    preliminary injunction, Roxane is going to rely on much of the

19    same defenses that Actavis is as well as the irreparable harm

20    issue.

21             THE COURT:  Including the licensing issue?

22             MR. CLEMONT:  With regard to Roxane it's a little bit

23    different than with regard to Actavis.  From my understanding

24    of the license agreement that Roxane has we have a slightly

25    broader definition of the license.  Our license, because we

D8QFENDA

were involved in the earlier cases as well, and Roxane settled
with Endo then, but as far as Roxane, they also got a license
to all patents claiming a common priority with the patents, any
patents that Endo would get.  What's interesting here, your
Honor, is that the two patents, the '122 and the '216 patent
claim a common priority to I think it was the '250 patent which
was part of the license.  So we think we have a little bit
stronger of a position on the prior license than what Actavis
is saying.

        We also have, your Honor, Johnson Matthey, who is the
supplier of our active, is a company that Roxane had a supply
agreement with before Endo purchased the patent and if you read
Endo's preliminary injunction papers against Roxane you'll see
that they even say that to the extent that Roxane is purchasing
product from Johnson Matthey, they're not going after Roxane on
that.  There is no grounds for infringement.  We have a license
there.  So we think we have licenses on all the patents.

        We also think that the invalidity case here is
extremely strong.  What happened before the Federal Circuit,
and Mr. Weiss was correct, is that it was an appeal from a
Patent Office procedure, and what the Federal Circuit said in
there is there was a hole in the prior art that the Federal
Circuit was looking at and it was whether or not there was this
paddle testing of oxymorphone.  We have found prior art, not
only the Hanson Dissolution Handbook, which equates a 100 rpm

D8QFENDA

 1   basket to 50 rpm paddles, we have found prior art showing what

 2   an extended release oxymorphone product should have for a

 3   dissolution profile in a basket.  This was not prior art that

 4   the Federal Circuit was looking at when they issued that

 5   decision.  So we think there are very extreme issues with

 6   regard to the validity.

 7           With regard to the validity of the '482 we agree with

 8   Actavis on the interference issue, that Mallinckrodt as the

 9   senior party has priority unless Endo can show differently and

10   that raises a substantial question of patentability.  Then when

11   we get to the irreparable harm prong of the preliminary

12   injunction analysis there are at least four factors which we

13   think weigh heavily in the fact that Endo cannot show

14   irreparable harm.  One, Endo doesn't even sell this product.

15   They withdrew their NDA.  The product that Roxane is trying to

16   bring to market is not a product that Endo sells.  Endo permits

17   another manufacturer to be out there selling.  They licensed

18   Impax.  How are they irreparably harmed if they let someone

19   else on the market?

20           They also let Actavis on the market with two strengths

21   of the product.  How are they irreparably harmed?  In order to

22   show irreparable harm you have to show you're not willing to

23   license the patents.  They're willing to license the patents.

24           The other factor I'd like your Honor to consider is

25   Endo previously licensed this product to all the defendants in

D8QFENDA

1    the prior New Jersey cases.  They said, okay, we have this

2    product.  They didn't know they were getting new patents at

3    that time.  For all they knew they weren't getting new patents.

4    They said go ahead out on the market generics, here's licenses.

5    You can get out into the market.  So I think, your Honor, when

6    you look at this very closely from the irreparable harm

7    standpoint from the -- one other factor, your Honor, on the

8    irreparable harm is Endo itself is being sued for patent

9    infringement on this product by a company called Depomed, so

10   they're not sure they're going to be allowed to market this

11   product.

12        So, in summary, when you think about it with regard to

13   the two main harms, the irreparable harm and the likelihood of

14   success, Endo can satisfy neither.

15        THE COURT:  Okay.  Let me hear, I imagine Mr. Rhoad

16   has something to say.

17        MR. BLACK:  He probably does.  I'm going to speak for

18   him, Mr. Black.

19        THE COURT:  Mr. Black.  Go ahead.

20        MR. BLACK:  Yes, of course I do.  Let's go step by

21   step through the analysis here.  First of all, as plaintiff our

22   burden is to show infringement.  You didn't hear a word about

23   infringement.  That's not on the table.  With respect to

24   validity, they bear the burden on clear and convincing

25   evidence.  It's not enough for the lawyers to point to some

D8QFENDA

1    piece of prior art or make an argument in a courtroom.  They

2    have to show by clear and convincing evidence that they have a

3    likelihood of success at trial and we don't believe they can

4    meet that very high burden.  In fact, we don't have to do

5    anything other than stand on the issuance of the patent by the

6    Patent Office and here we even have Federal Circuit

7    determination on one of the patents which is highly unusual.

8    So to rule in their favor on validity your Honor would have to

9    consider the clear and convincing evidence standard, the

10   Federal Circuit decision and the evidence before it that the

11   patent is likely to be held invalid and we don't believe

12   they're going to meet that burden.

13            On irreparable harm --

14        THE COURT:  What about the license issue?

15        MR. BLACK:  Yes, certainly, your Honor.  We had prior

16   litigation relating to several patents.  That litigation was

17   settled.  As is common in litigation of -- with branded and

18   generics, the settlement was in the form of, okay, we will put

19   down our weapons, the patent life that's left on this patent is

20   till a certain date.  We'll split the baby and allow you guys

21   to come into the market on a certain date and that's what we

22   did.  The three patents that are at issue in this case were not

23   at issue in the prior case.

24        THE COURT:  What they're talking about is product.

25        MR. BLACK:  Yes.  That's what's wrong with their

D8QFENDA

1    entire analysis.  They don't have a license to every patent

2    from the beginning of time till the end of time related to this

3    product.  They do not have that kind of license.

4            THE COURT:  Doesn't it depend on what the license

5    says?  Does the license use the word product or not?

6            MR. BLACK:  Yes, your Honor, it absolutely depends on

7    what the license says and what the parties' intent was and the

8    surrounding circumstances.  They do not have a license on these

9    patents.  The agreement does not identify the patents at issue

10   in this case either explicitly or implicitly as licensed

11   patents.

12           THE COURT:  Do the licenses use the word "product"?

13           MR. BLACK:  Yes.

14           THE COURT:  That's what they're talking about is

15   product?

16           MR. BLACK:  Right, but the license is in the form of

17   it says you are licensed to the following patents A, B and C

18   with respect to product X.  They did not get a license with

19   respect to patents that were outside the litigation.  We

20   settled what was in the litigation.  We did not agree to settle

21   or give them a license with respect to things that were not

22   being litigated.

23           THE COURT:  Okay, go ahead.

24           MR. BLACK:  Two of the patents at issue didn't even

25   exist during the litigation, could not have been raised, they

D8QFENDA

1   didn't even exist.  The third patent was owned by a third party

2   who was uninvolved in the litigation and I'm not even sure when

3   we became aware of it, I think it was probably after the

4   settlement.  We purchased that patent.  We have a right to

5   assert it.  They don't have a license to any of those patents

6   because that's not what the settlement of the litigation was

7   about and the license by its terms does not give them rights in

8   those patents.

9        THE COURT:  What I don't understand is quite from a

10  business standpoint or practical standpoint why we have this

11  litigation.  You had an earlier litigation and licenses were

12  granted and I certainly haven't read the licenses and I don't

13  know the terms of the licenses, but there were licenses.  And

14  are those licenses still in effect or have they run out or are

15  they still in effect?

16       MR. BLACK:  They are -- I'm hesitating because the

17  licenses may differ between the two parties.  One of them may

18  have expired, one of them may still be in effect, I have to

19  actually check that.  The licenses are tied to specific patents

20  though, your Honor.  That's the issue.  They're not tied to the

21  product.  They obtained a settlement of pending litigations.

22       THE COURT:  Could I just see the language of the

23  license?

24       MR. WEISS:  I have copies I can hand out.

25       THE COURT:  I don't want to read a thousand-page

D8QFENDA

```
 1     encyclopedia, but can I just see the language you're talking
 2     about and the language he's talking about?
 3              MR. CLEMONT:  Your Honor, Actavis and Roxane have
 4     slightly different language.
 5              THE COURT:  Now, what's the language that I could,
 6     that would be helpful to focus on?
 7              MR. CLEMONT:  Your Honor, on behalf of Roxane I'm
 8     looking at Section 1.16B where it's talking about the licensed
 9     patents.  Are you there?
10              THE COURT:  I am there.
11              MR. CLEMONT:  Okay.  It says, what they're licensing
12     are any United States patent application that claim priority to
13     the Opana ER patents.  Okay?  That's very important.  That
14     claim priority.  The Opana ER patents that are defined which is
15     down on 1.20, they have a common priority to the two patents,
16     the '122 and the '216 patents in suit here.  So that license is
17     a license --
18              THE COURT:  Where is the language about product?
19              MR. CLEMONT:  I'm not arguing product, your Honor.
20     I'm arguing we have a patent under the license.
21              THE COURT:  Let's go back to the other defendant.
22     Where is the language about product?
23              MR. WEISS:  Yes, your Honor.  So, I'll sit so the
24     microphone works better.  I would draw your Honor's attention
25     first to Section 4.1.  This is on page 6 of 19.
```

D8QFENDA

```
1              THE COURT:  Okay.

2              MR. WEISS:  And you see 4.1A and I'm not going to

3    purport to quote.  I'm going to skip some of the things.  But

4    it says subject to the terms and conditions hereof, there's a

5    royalty license and if you look in the center, it's there, to

6    make, have made, offer to sell, sell, import and use the Opana

7    ER generic products in the territory, etc. B has a covenant not

8    to sue.

9              THE COURT:  Wait a minute.  Let's look at 4.1.

10             MR. BLACK:  If you'll note, your Honor, in 4.1 it says

11   that the license is under the asserted patent and that's all in

12   caps.

13             MR. WEISS:  We'll get to the --

14             MR. BLACK:  Guess you don't want to talk about that.

15             MR. WEISS:  I'll get there.

16             MR. BLACK:  In the sixth line, only under the asserted

17   patent, all in capitals, and that's a defined term on the first

18   page of the agreement.

19             MR. WEISS:  I haven't gotten to the rest of it yet.

20             THE COURT:  Let's have one at a time, please.

21             MR. WEISS:  If I could continue, your Honor.

22             THE COURT:  Yes.

23             MR. WEISS:  So 4.1 there's a license under the

24   asserted patent to make, use, sell Opana ER product.  4.1B --

25             THE COURT:  Wait a minute.  4.1 I still am not sure I
```

D8QFENDA

1    see the language you're talking about.

2              MR. WEISS:  Okay, your Honor.  So 4.1A, it's about

3    five lines up from the bottom of the paragraph.

4              THE COURT:  Okay.  One, two, three, four -- I'm there.

5              MR. WEISS:  Okay.  Do you see where it says under the

6    asserted patent during the licensed term --

7              THE COURT:  Wait a minute.  Under the asserted patent

8    during the licensed term.

9              MR. WEISS:  Right, to make, have made, offer to sell,

10   sell, import and use the Opana ER generic product in the

11   territory, and it goes on from there.  So there's no question

12   that what we have here is Opana ER generic product.  The

13   question is whether it's licensed under the patent that Endo is

14   asserting.  Now, Mr. Black points out correctly that 4.1A says

15   asserted patent but 4.1B --

16             THE COURT:  Okay.

17             MR. WEISS:  During the covenant term, which is until

18   everything runs, Endo and PennWest, that was the co-owner of

19   some of these patents covenant not to sue Actavis or its

20   affiliates for its infringement of or otherwise assert, and

21   here we have a broader term, the Opana ER patents.

22             THE COURT:  Yeah, okay.

23             MR. WEISS:  And, again, based on the manufacture, use,

24   import, sale, offer for sale of Opana ER products.  So we have

25   a license for one patent, we have a covenant not to sue with

D8QFENDA

| 1 | respect to this defined term Opana ER patents for our product

| 2 | which is the Opana ER generic product.

| 3 |         Now, if you turn back, your Honor, to page 3 of the

| 4 | license agreement, we have some defined terms.

| 5 |         THE COURT:  Okay.

| 6 |         MR. WEISS:  The first full one is Opana ER generic

| 7 | product means any product that's marketed or sold under the

| 8 | Actavis ANDA.  That's what we have here.  Then we have Opana ER

| 9 | patents, which is what's covenant not to sue and that's

| 10 | broader.  It says the asserted patents and U.S. patents 5128143

| 11 | and then 5662993 and then 7276250.  And any continuations,

| 12 | continuations in part or divisionals and any U.S. patents

| 13 | resulting from any reissue or re-examination.  So this was not

| 14 | just patents in existence in 2009.  This is continuations,

| 15 | continuations in part, divisionals and two of the patents at

| 16 | issue here which are the ones that Endo prosecuted itself and

| 17 | these are the '216 patent and the '122 patent are continuations

| 18 | of one of these patents.  They're continuations of 7276250.

| 19 |         THE COURT:  Can I interrupt?  I thought it might, the

| 20 | way you described the license dealing with products I thought

| 21 | maybe there was some language here that was rather easily

| 22 | interpreted about products.  Well, the language is not easily

| 23 | interpreted and at least to me sitting here, so I'm not going

| 24 | to pursue this any further.

| 25 |         What I'm wondering is would there be any advantage,

D8QFENDA

1   and there probably would not, but I'm going to ask it anyway,

2   would there be any advantage, since there's not a jury here,

3   would there be any advantage of having a hearing about the

4   license issue, because if there is a license that allows the

5   defendants to do what they say the license allows, then that's

6   it.  Obviously -- is there any advantage in splitting it up?

7   There probably is not but I just ask the question,splitting up

8   the license versus the validity issue.

9           MR. WEISS:  I think, your Honor, there might be.  The

10  reason is, and again, I'm going to come back that your Honor is

11  looking at this for the entirety now, obviously.

12          THE COURT:  Of course.

13          MR. WEISS:  The license part of our brief is about

14  five pages.  And the presumptions for a preliminary injunction

15  that apply at trial are kind of reversed.  So we cite a case,

16  it's in footnote 13 of our brief, Display Tech v. Display

17  Industries, it's a 2011 opinion from Judge Pauley dealing with

18  a preliminary injunction in a patent case and the burden to get

19  a preliminary injunction is on the plaintiff to produce

20  countervailing evidence that the defense lacks substantial

21  merit.  So we're not talking about summary judgment here.

22  We're talking about can they prove that the license defense

23  lacks substantial merit.

24          Now, I don't see why this license agreement is not

25  going to be subject to the parol evidence rule.  It's an

D8QFENDA

 1   integrated agreement.  And as your Honor points out if the

 2   license issue is found to be a substantial issue then the

 3   preliminary injunction has to be denied.  That is dispositive

 4   to the preliminary injunction.

 5       I personally believe that it would be probably ripe

 6   for summary judgment also.  But if your Honor wanted to take a

 7   quick response from Endo on this -- they only saw our papers

 8   this morning also -- maybe we could quickly put in a reply,

 9   your Honor could read the cases about implied licenses and

10   estoppel that we cite, the Federal Circuit decision in

11   TransCore and see what the Court thinks.

12       I don't think in terms of a hearing if your Honor

13   means an evidentiary hearing, I don't think there's as I see it

14   any witnesses to present or credibility issues.  There's no

15   dispute as to what the documents are.  Now, if Endo would try

16   to bring in somebody to say, well, what I had in mind was

17   something different, again, whether that would negate a

18   substantial issue I have no idea.  It could get parol evidence

19   problems.  But we are potentially I think looking at an issue

20   here that could not only be dispositive of a preliminary

21   injunction but could be case dispositive.  So it might be

22   an extremely efficient way to proceed and I think it's

23   something, depending on what your Honor's schedule is, that

24   your Honor could look at a lot faster than trying to wade

25   through a foot and a half of paper in regard to the dissolution

D8QFENDA

1      patents.

2              THE COURT:  I'm going to ask you about timing, because

3      we have in our court as the federal courts generally do

4      September 30 and March 31 as dates when we all try to dispose

5      of old motions as much as possible.  And we work very hard for

6      those dates.  Obviously, I can do anything that I need to do.

7      I can have a hearing in September or whatever, but what are the

8      timing problems here, because, well, I'm just asking.  What are

9      the timing problems?  I better ask Mr. Black.

10             MR. BLACK:  Your Honor, from our perspective we're

11     amenable to any schedule that works for the Court as long as

12     we're not faced with a fait accomplis in the market that has

13     launched.

14             THE COURT:  As long as you're not faced with what?

15             MR. BLACK:  As long as we're not faced with a change

16     in the status quo, that is they've launched a generic product

17     in the market before we have an opportunity to have our

18     injunction motion decided.  There's a practical issue with

19     Roxane.  We haven't seen any responsive papers from Roxane yet

20     and Actavis' papers were filed this morning.  But as far as

21     setting a schedule to decide on whether their side has a

22     summary judgment, entitlement to summary judgment on license,

23     we would be fine with a procedure that went along that route so

24     long as we weren't waiving our right to seek injunctive relief.

25             THE COURT:  What are the plans of the defense?

D8QFENDA

1          MR. CLEMONT:  Your Honor, for Roxane, we still have to

2    submit papers.  We would be happy to submit papers on this

3    issue of license.  We think it applies even more to Roxane than

4    to Actavis.

5          THE COURT:  I'm asking you about timing.  What are

6    your plans with your products?

7          MR. CLEMONT:  Your Honor, as far as Roxane, we have

8    told Endo that we would give them 30 days notice before we were

9    to launch anything.  We have not yet given them that notice.

10   So there is no urgency with regard to Roxane at this point in

11   time.

12         THE COURT:  Actavis.

13         MR. WEISS:  Your Honor, I hate to ask this, but there

14   are a number of people who came into the courtroom after the

15   parties.  I don't know who they are and I'm reluctant to get

16   into sensitive commercial information in open court in front of

17   people who I don't know.  I would certainly --

18         THE COURT:  Well, wait a minute.  I'll take care of

19   that.  We could just the lawyers and I step back to the robing

20   room with the reporter and we'll have this on a sealed record

21   for the moment.

22              (Pages 35 - 37 SEALED by order of the Court)

23

24

25